# Exhibit 3

1 of 1 DOCUMENT

Copyright 2006 The Financial Times Limited
Financial Times (London, England)

June 2, 2006 Friday
London Edition 1

**SECTION:** COMMENT; Pg. 15

**LENGTH:** 1050 words

**HEADLINE:** Lessons of the stock options scandal HARVEY PITT

**BYLINE:** By HARVEY PITT

**BODY:**

Executive compensation is handled badly by far too many publicly held companies. Contrary to some views, it is not the amount of compensation that is the problem. Rather, it is the methodology by which companies award compensation and then monitor whether they have received performance, or merely a pulse, for the pay they provide.

Issues of amount and methodology tend to be conflated and then confused as compensation continues to rise, often faster than many companies' profits. As if this were not bad enough, we now have an unfolding scandal over alleged backdating of option grants to senior executives. Even though it is unlikely we will find much of this misconduct occurring after Sarbanes-Oxley was enacted, this is more than of historical interest. There are important lessons to be learnt from this scandal.

For one thing, options backdating may be used those who fear current efforts to repair what is wrong with SOX. Hastily and badly drafted, SOX suffers from multiple deficiencies. But, in the context of options backdating, one noteÃÂworthy provision is section 403, requiring options grants to be reported in two business days. This has diminished the apparently widespread practice of backdating options to take advantage of a low in the company's share price or an expected rise in price.

While there is a need to refine SOX - at a minimum, its one-size-fits-allphilosophy should be changed - this scandal will be used by opponents of change to argue that any tinkering with the statute could undermine important benefits the statute provides.

Options backdating calls a company's internal controls into question. Many discussions of backdating options start with the observation that backdating is not, per se, illegal. That is wrong. Options backdating frequently involves falsification of records used to gain access to corporate assets. That conduct violates the Foreign Corrupt Practices Act and its internal controls requirements. If corporate directors were complicit in these efforts, state law fiduciary obligations are violated. Backdating is not only illegal and unethical, it points to a lack ofintegrity in a company's internal controls.

With more and more companies being identified as having a backdating problem, the issue for regulators, prosecutors and plaintiffs' attorneys is who was at fault. Already, executives have resigned or been fired, with more casualties sure to follow. But from the company/shareholder perspective, the question is more properly one of how to move forward. For that, solutions must start with the board of directors and its compensation committee.

Compensation decisions should not be treated as if they were trivial. Boards and compensation committees must develop a sensible methodology for determining what they expect from senior managers and how to measure performance. The huge amount of unrealised gains amassed by some senior executives shows that we are talking about large amounts of money.

Among other things, compensation committees need to develop objective standards for each senior manager to achieve. They need to avoid reliance on subjective or easily manipulated criteria such as share price or earnings per

share and decide what each standard is worth as a portion of total compensation. Measurements must be developed that are well understood by managers and those who monitor actual performance. A discussion of compensation should provide transparency into compensation standards and decisions, setting out what standards are applied, how well they are fulfilled and what consequences flow. Committees need to monitor the reporting of options and compare them with the dates on which grants were supposed to take place.

Larger public companies should also consider appointing an internal compensation officer. He or she could ensure that compensation decisions are handled appropriately, recorded and then carried out. Similarly, compensation consultants should be paid for meaningful analysis and advice, not for the rote ways in which so many of these consultants operate. Often, these consultants are hired for compensation committees by senior management. If this ever made sense, it no longer does. Consultants should be selected by compensation committees and be wholly independent of management.

The standard drill many compensation consultants follow is to identify five comparable companies, calculate the spread of compensation for each major management position, and tell compensation committees to pay their officers at least 75 per cent of the average. The fact that companies actually have paid, and sometimes extravagantly, for this kind of advice is a testament to the fact that you can sell almost anything. Nor should compensation lawyers be overlooked. They need to do a better job of explaining, and then monitoring, compensation requirements, processes and decisions.

In the light of the backdating scandal, it seems that more and more members of compensation committees, not to mention others, were unaware of the negative tax significance of getting options grant practices wrong. When the totals are tallied, we may well be talking more than Dollars 1bn (Pounds 532m) in lost tax deductions for those companies involved. This means that, at many companies, getting options grants wrong may result in significant restatements of financial results.

Finally, the accounting profession needs to reconsider its standards. At present, if companies are manipulating their documentation, it is unlikely that accountants will find it, no matter how bright or diligent. But the considerable breadth of this problem to date suggests that auditors need to spend more time with their audit clients identifying critical controls, and then evaluating how well those controls are applied and how easily they can be avoided.

When I was at the US Securities and Exchange Commission, we often remarked on the driverless car syndrome: when corporate fraud occurred, very often those who served in positions of responsibility would deny that they were driving at the time of the wreck. The only way to avoid a recurrence of this scandal is to make sure many different hands are at the wheel.

The writer is the chief executive of Kalorama Partners, the strategic consulting firm. From 2001 to 2003, he was chairman of the SEC

**LOAD-DATE:** June 1, 2006