SCHIFFRIN BARROWAY TOPAZ & KESSLER, LLP
Alan R. Plutzik, Of Counsel (Bar No. 077785)
L. Timothy Fisher, Of Counsel (Bar No. 191626)
Nichole Browning (Bar No. 251937)
2125 Oak Grove Road, Suite 120
Walnut Creek, California 94589
Telephone: (925) 945-0770
Facsimile: (925) 945-8792
　　　-and-
Eric L. Zagar (Bar No. 250519)
J. Daniel Albert
280 King of Prussia Road
Radnor, PA  19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH D. WILDER, et al., Derivatively on Behalf of SONIC SOLUTIONS, <br><br> Plaintiffs, <br><br> vs. <br><br> ROBERT J. DORIS, et al., <br><br> Defendants, <br><br> — and — <br><br> SONIC SOLUTIONS, a California corporation, <br><br> Nominal Defendant. | No. C-07-1500-CW <br><br> **CONSOLIDATED CLASS ACTION AND SHAREHOLDER DERIVATIVE COMPLAINT** |

Lead Plaintiffs James Forseth and Andrew Walter and Plaintiff James Pinno, by the undersigned attorneys, submit this Consolidated Class Action and Shareholder Derivative Complaint (the "Complaint") against the defendants named herein.

1

## NATURE AND SUMMARY OF THE ACTION

2      1.      This is a shareholder derivative action brought for the benefit of nominal
3  defendant Sonic Solutions ("Sonic" or the "Company") against certain current and former
4  members of its Board of Directors (the "Board") and certain of its executive officers seeking to
5  remedy defendants' breaches of fiduciary duties, unjust enrichment, violations of federal
6  securities laws and other violations of law.

7      2.      This action arises from the Individual Defendants (as defined herein) repeated and
8  egregious breach of their fiduciary duties to the Company and its shareholders by approving
9  and/or acquiescing in the issuance of Sonic stock options to Company executives, employees and
10  directors that were unlawfully "backdated" to provide the recipients with windfall compensation
11  at the direct expense of the Company.  From 1995 to 2003, Sonic's directors, along with its top
12  executive officers, engaged in a secret scheme to grant undisclosed, "in the money" stock options
13  to themselves and others by backdating stock option grants to coincide with low closing stock
14  prices.

15      3.      A stock option is the right to purchase a stock for a specified period of time at a
16  fixed price, called the "exercise price" or "strike price."  The exercise price is generally fixed to
17  the market price of the stock on the date of grant.  If the stock's market price exceeds the
18  exercise price, the stock option holder may exercise the option, by purchasing the stock from the
19  Company at the exercise price and reselling it at the higher market price, profiting from the
20  difference.

21      4.      When the grant date of a stock option is manipulated to an earlier date on which
22  the stock closed at a lower price – *i.e.*, when the stock option is "backdated" – the grantee pays
23  less for the stock and the corporation, the counterparty to the stock option grant, receives less
24  when the stock option is exercised.  When stock options are backdated in this manner for the
25  benefit of insiders (as they were in this case), the stated purposes behind the Company's stock
26  option plans – to align the interests of shareholders, executives and employees – is undermined
27  to the detriment of the Company and its shareholders, because the stock options are already "in

28

Case 4:07-cv-01500-CW    Document 63    Filed 04/30/2008    Page 3 of 83

1   the money"[1] when granted.  Backdating stock option grants, therefore, represents a direct and
2   continuing waste of valuable corporate assets.

3        5.    To achieve the Company's stated goal of aligning the interests of shareholders,
4   executives and employees, the Company's shareholder-approved stock option plans provide that
5   the exercise price of a stock option shall in no event be less than the Fair Market Value of
6   Sonic's common stock on the date of grant.  However, the Individual Defendants blatantly
7   violated this and other provisions of the Company's stock option plans by backdating stock
8   options in order to illegally maximize the grantees' profits.  As such, and as detailed below, the
9   Individual Defendants' acts were *ultra vires* – unauthorized and beyond the scope of power
10  granted to them.

11       6.    The timing and pattern of option grants from 1995 to 2003 to Sonic executives is
12  striking.  As shown  below, thirteen out of the Company's sixteen (81%) publicly-reported stock
13  option grants to top Sonic executives from 1995 to 2003 were backdated.[2]  The three stock
14  option grants that were not backdated were granted on the day of the Company's Annual
15  Meeting of Shareholders.

16       7.    Plaintiffs have conducted a statistical analysis which is identical in methodology
17  to that of the Merrill Lynch analysis, which has been accepted by t he Delaware Court of
18  Chancery and a number of federal district courts as indicating a pattern of backdating.
19  Plaintiffs' statistical analysis supports an inference of backdating and indicates that over the
20  period from 1995 through 2003, the average annualized return for stock option grants to Sonic
21  executives based on a twenty-day trading window following the date of grant was *637%* versus
22  the average annualized investor return of 31%.  In other words, during the period from 1995 to
23  2003, backdated stock options issued to Sonic insiders outperformed returns on common stock
24  owned by ordinary investors by  more than *twenty times* .

25

26  [1] "In the money" refers to when the exercise price of a stock option is below the market price of the underlying
27  stock. *See* infra.
    [2] The pattern excludes certain grants that were cancelled and re-priced pursuant to a Board authorized re-pricing
28  plan instituted on March 3, 1998.
    CONSOLIDATED CLASS ACTION AND SHAREHOLDER DERIVATIVE COMPLAINT
    Case No. C-07-1500-CW

8.     Sonic's backdating of stock options is not only demonstrated by statistical improbability. Sonic has now *admitted* to backdating. Indeed, the Company announced in the Company's Form 10-K filed with the SEC on February 26, 2008, that, among other things, *the Company did not correctly account for stock option grants* and, as a result, the Company recorded a net expense, before taxes, of *$37.7 million* for fiscal years ended March 31, 1998 through March 31, 2006 and the six months ended September 30, 2006.

9.     As demonstrated below, these perfectly-timed option grants could not have been the result of mere coincidence. They were, in fact, the result of improper and opportunistic option granting practices. Moreover, because certain defendants caused the Company to fail to comply with the Generally Accepted Accounting Principles ("GAAP") governing stock-based compensation, Sonic's financial statements from fiscal years ended March 31, 1996 through March 31, 2003 were materially false and misleading. In addition, defendants concealed their misconduct by filing false and misleading proxy statements and Forms 4 that contained the false grant dates, thus enabling their scheme to continue undetected for years.

10.     By engaging in this scheme, the Individual Defendants were able to conceal that Sonic was not recording material compensation expenses and was materially overstating the Company's net income (or materially understating its net loss) from at least 1995 to 2003. Keeping the scheme secret also hid the injury to the Company which occurred when executives and employees exercised the options and made capital contributions to Sonic that were less than they should have paid, had the options not been granted in the money. As a result of the egregious misconduct by certain defendants, Sonic has suffered, and will continue to suffer, significant financial and non-monetary damages and injuries, including damage to its reputation and loss of goodwill in general, and considerable financial cost in having to review and restate previously-issued financial statements. Indeed, the Company announced that, as of December 31, 2007, the Company expended approximately *$6.7 million* in costs connected to the Company's stock option investigation. In addition, Sonic has been exposed to civil liability and potential regulatory fines by the SEC and Internal Revenue Service for failure to pay or withhold

taxes.

11.    There is no credible defense to the practice of backdating, nor serious dispute about the harm it causes to a corporation. Some of these harms which Sonic has suffered were identified in a report issued by the Center for Financial Research and Analysis on May 16, 2006, entitled "*Options Backdating – Which Companies Are at Risk?*":

- **SEC investigation risk** – The SEC has begun information investigations at many companies in recent months and has also begun to call for improved disclosures around all areas of executive compensation.

- **Accounting restatement risk** – Some companies which have admitted backdating options have accompanied those admissions with financial restatements impacting both the balance sheet and earnings.

- **Tax/Cash implications** – The change in options from the practice of options backdating may force some companies to restate tax positions for the years in question, which could result in an obligation to pay back taxes.

- **Management credibility risk** – If a reputable management team is found to have repeatedly backdated options, thereby enriching themselves at the expense of shareholder, the reputation of management (and the related stock premium for superior management) could take a hit.

12.    As alleged in detail herein, in gross breach of their fiduciary duties as officers and/or directors of Sonic, the Individual Defendants colluded with one another to:

a.    improperly backdate grants of stock options to the Company's executive officers and other employees, in violation of the Company's shareholder approved stock option plans;

b.    improperly record and account for the backdated stock options, in violation of GAAP;

c.    improperly take tax deductions based on the backdated stock options, in violation of Section 162(m) of the Internal Revenue Code, 26 U.S.C. § 162(m) ("Section 162(m)"); and

d.    produce and disseminate false financial statements and other false Securities and Exchange Commission ("SEC") filings to Sonic's shareholders and the market that improperly recorded and accounted for the backdated stock option grants and concealed the improper backdating of stock options.

13.    As a result of the Individual Defendants' egregious misconduct, all of which

1   emanated from California, Sonic has sustained significant damages and the recipients of the
2   backdated stock options have garnered unlawful proceeds.

3                              **JURISDICTION AND VENUE**

4           14.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that
5   this Complaint states a federal question. This Court has supplemental jurisdiction over the state
6   law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This Court also has jurisdiction over
7   this action pursuant to 28 U.S.C § 1332(a)(2) in that Plaintiffs and Defendants are citizens of
8   different states and the matter in controversy exceeds $75,000, exclusive of interests and costs.
9   This action is not a collusive one to confer jurisdiction on a court of the United States which it
10  would not otherwise have.

11          15.    The claims asserted herein arise under the Securities Exchange Act of 1934
12  ("Exchange Act"), as well as under California law. In connection with the acts, conduct, and
13  other wrongs complained of herein, defendants, directly or indirectly, used the means and
14  instrumentalities of interstate commerce, the facilities of a national securities market, and the
15  United States mail.

16          16.    Venue is proper in this district because a substantial portion of the transactions
17  and wrongs complained of herein, including the defendants' primary participation in the
18  wrongful acts detailed herein, occurred in this district. One or more of the defendants either
19  resides in or maintains executive offices in this district, and defendants have received substantial
20  compensation in this district by engaging in numerous activities and conducting business here,
21  which had an effect in this district.

22                                   **PARTIES**

23                                   **Plaintiffs**

24          17.    Lead Plaintiff James Forseth ("Forseth") purchased Sonic common stock on
25  November 5, 1998, has continuously held stock in Sonic since then, and continues to hold his
26  shares of Sonic common stock. Forseth is a citizen of the State of Montana.

27          18.    Lead Plaintiff Andrew Walter ("Walter") purchased Sonic common stock on

28

1 December 28, 2004, has continuously held stock in Sonic since then, and continues to hold his
2 shares of Sonic common stock.  Walter is a citizen of the State of Washington.

3   19. Plaintiff James Pinno ("Pinno") purchased Sonic common stock on March 29,
4 1996, has continuously held stock in Sonic since then, and continues to hold his shares of Sonic
5 common stock.  Pinno is a citizen of the state of Connecticut.

6         **Nominal Defendant**

7   20. Nominal defendant Sonic is a California corporation with its principal executive
8 offices located at 101 Rowland Way, Suite 110, Novato, California 94945.  According to its
9 public filings, Sonic develops and markets computer software related to digital media.

10   21. At the time of the events alleged in this complaint, Sonic had common stock
11 registered with the SEC and listed on the NASDAQ National Market under the ticker symbol
12 "SNIC".  As a registered company, Sonic was required to file certain disclosure forms with the
13 SEC, including Forms 10-Q, 10-K, and DEF 14-A, relating to financial information and proxy
14 solicitation, and Sonic's executives were required to file Forms 3, 4 and 5 relating to transactions
15 in Sonic securities, including stock options.

16 **Defendant Doris**

17   22. Defendant Robert J. Doris ("Doris") co-founded the Company in 1986 and has
18 served as Chairman of the Board since September 2005.  Doris also served as the Company's
19 Chief Executive Officer ("CEO") and Chairman of the Board from April 2005 to September
20 2005, and as Chairman of the Board, President and CEO from 1986 to April 2005.  Doris is
21 married to defendant Mary C. Sauer.  Upon information and belief, Doris is a citizen of the State
22 of California.

23   23. Doris signed Sonic's false and misleading financial statements for fiscal years
24 1995-2002.  Doris also received personal financial benefits in the form of at least 435,000
25 backdated or manipulated Sonic stock options.

26 **Defendant Sauer**

27   24. Defendant Mary C. Sauer ("Sauer") co-founded the Company in 1986 and has

28

1   served as a director since 1986. Sauer also served as a vice president of the Company from 1986

2   to September 2005, including as Senior Vice President of Marketing and Sales from February

3   1993 to September 2005. Sauer is married to defendant Doris. Upon information and belief,

4   Sauer is a citizen of the State of California.

5        25.    Sauer signed Sonic's false and misleading financial statements for fiscal years

6   1995-2002. Sauer also received personal financial benefits in the form of at least 282,000

7   backdated or manipulated Sonic stock options.

8   **Defendant Moorer**

9        26.    Defendant James A. Moorer ("Moorer") served as a director and a vice president

10   of the Company, including Senior Vice President of Audio Development from February 1993 to

11   1998. Upon information and belief, Moorer is a citizen of the State of Florida.

12        27.    Moorer signed Sonic's false and misleading financial statements for fiscal years

13   1995-1997. Moorer also received personal financial benefits in the form of at least 25,000

14   backdated or manipulated Sonic stock options.

15   **Defendant Child**

16        28.    Defendant Michael C. Child ("Child") served as a director of the Company from

17   August 1993 to September 1999 and as a member of the Audit Committee of the Board (the

18   "Audit Committee") from at least 1995 to September 1999. Upon information and belief, Child

19   is a citizen of the State of California.

20        29.    Child signed Sonic's false and misleading financial statements for fiscal years

21   1995-1998.

22   **Defendant Greber**

23        30.    Defendant Robert M. Greber ("Greber") has served as a director of the Company

24   since August 1993 and as a member of the Audit Committee since at least 1995, including as

25   Chairman since 2004. Upon information and belief, Greber is a citizen of the State of California.

26        31.    Greber signed Sonic's false and misleading financial statements for fiscal years

27   1995-2002.

28

1   **Defendant Marguglio**

2       32.    Defendant Peter J. Marguglio ("Marguglio") has served as a director of the

3   Company since August 1986 and as a member of the Audit Committee since at least 1995. Upon

4   information and belief, Marguglio is a citizen of the State of California.

5       33.    Marguglio signed Sonic's false and misleading financial statements for fiscal

6   years 1995-2002.

7   **Defendant Langley**

8       34.    Defendant R. Warren Langley ("Langley") has served as a director of the

9   Company and as a member of the Audit Committee since June 2001. Upon information and

10  belief, Langley is a citizen of the State of California.

11      35.    Langley signed Sonic's false and misleading financial statements for fiscal years

12  2000-2002.

13  **Defendant Leighton**

14      36.    Defendant A. Clay Leighton ("Leighton") served as the Company's Executive

15  Vice President and Chief Financial Officer ("CFO") from September 2006 until his

16  "reassignment" to Chief Operating Officer announced by the Company on February 26, 2008,

17  following the release of the findings of the Company's Audit Committee Investigation. Leighton

18  previously served as the Company's Senior Vice President of Worldwide Operations and

19  Finance and CFO from January 1999 to September 2006, and as Vice President of Finance from

20  February 1993 to January 1999. Upon information and belief, Leighton is a citizen of the State

21  of California.

22      37.    Leighton signed Sonic's false and misleading financial statements for fiscal years

23  1995-2002. Leighton also received personal financial benefits in the form of at least 660,000

24  backdated or manipulated Sonic stock options.

25  **Defendant Paulsen**

26      38.    Defendant Kirk Paulsen ("Paulsen") served in various positions after he joined the

27  Company in August 1991, including Vice President of Sales from at least 1994 to 1996 and Vice

28

1   President for European Operations from 1996 to October 1999. Upon information and belief,
2   Paulsen is a citizen of the State of California

3        39.    Paulsen received personal financial benefits in the form of at least 20,000
4   backdated or manipulated Sonic stock options.

5   **Defendant Costello**

6        40.    Defendant Michael J. Costello ("Costello") served as the Company's Vice
7   President of Operations from at least 1995 to March 1996. Upon information and belief,
8   Costello is a citizen of the State of California.

9        41.    Costello received personal financial benefits in the form of at least 14,000
10  backdated or manipulated Sonic stock options.

11  **Defendant Kryzan**

12       42.    Defendant Christoper A. Kryzan ("Kryzan") served as the Company's Senior
13  Vice President, Engineering and Marketing from January 1999 to May 2003, and as Vice
14  President of Marketing from March 1996 to January 1999. Upon information and belief, Kryzan
15  is a citizen of the State of California.

16       43.    Kryzan received personal financial benefits in the form of at least 283,000
17  backdated or manipulated Sonic stock options.

18                          **Individual Defendants**

19       44.    Collectively, defendants Doris, Sauer, Moorer, Child, Greber, Margugulio,
20  Langley, Leighton, Paulsen, Costello and Kryzan are referred to herein as the "Individual
21  Defendants."

22                  **DUTIES OF THE INDIVIDUAL DEFENDANTS**

23       45.    By reason of their positions as officers and/or directors of the Company and
24  because of their ability to control the business and corporate affairs of the Company, the
25  Individual Defendants owed the Company and its shareholders the fiduciary obligations of good
26  faith, trust, loyalty and due care, and were and are required to use their utmost ability to control
27  and manage the Company in a fair, just, honest and equitable manner. The Individual

28  CONSOLIDATED CLASS ACTION AND SHAREHOLDER DERIVATIVE COMPLAINT
    Case No. C-07-1500-CW

1    Defendants were and are required to act in furtherance of the best interests of the Company and

2    its shareholders so as to benefit all shareholders equally and not in furtherance of their personal

3    interest or benefit.  Each director and officer of the Company owes to the Company and its

4    shareholders the fiduciary duty to exercise good faith and diligence in the administration of the

5    affairs of the Company and in the use and preservation of its property and assets, and the highest

6    obligations of fair dealing.

7        46.    The Individual Defendants, because of their positions of control and authority as

8    directors and/or officers of the Company, were able to and did, directly and/or indirectly,

9    exercise control over the wrongful acts complained of herein.

10       47.    To discharge their duties, the Individual Defendants, as the officers and directors

11   of the Company, were required to exercise reasonable and prudent supervision over the

12   management, policies, practices and controls of the Company.  By virtue of such duties, the

13   Individual Defendants were required to, among other things:

14           a.    exercise good faith in ensuring that the affairs of the Company
15                were conducted in an efficient, businesslike manner so as to
                  make it possible to provide the highest quality performance of
16                its business;

17           b.    exercise good faith in ensuring that the Company was operated
                  in a diligent, honest and prudent manner and complied with all
18                applicable federal and state laws, rules, regulations and
                  requirements, including acting only within the scope of its legal
19                authority;

20           c.    exercise good faith in supervising the preparation, filing and/or
                  dissemination of financial statements, press releases, audits,
21                reports or other information required by law, and in examining
                  and evaluating any reports or examinations, audits or other
22                financial information concerning the financial condition of the
                  Company;

23           d.    exercise good faith in ensuring  that the Company's financial
                  statements were prepared in accordance with GAAP; and
24
25           e.    refrain from unduly benefiting themselves and other Company
                  insiders at the expense of the Company.

26       48.    The Individual Defendants were responsible for maintaining and establishing

27   adequate internal accounting controls for the Company and to ensure that the Company's

28   CONSOLIDATED CLASS ACTION AND SHAREHOLDER DERIVATIVE COMPLAINT
     Case No. C-07-1500-CW
                                                                            -11-

1   financial statements were based on accurate financial information.   According to GAAP, to

2   accomplish the objectives of accurately recording, processing, summarizing and reporting

3   financial data, a corporation must establish an internal accounting control structure.   Among

4   other things, the Individual Defendants, particularly the members of the Audit Committee, were

5   required to:

> (1)   make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and
>
> (2)   devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –
>
> > (a)   transactions are executed in accordance with management's general or specific authorization; and
> >
> > (b)   transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP.

### DUTIES AND RESPONSIBILITIES OF THE BOARD AND AUDIT COMMITTEE

49.   Notably, throughout the relevant period, each Report of the Board Regarding Executive Compensation in the Company's proxy statements filed with the SEC stated:

> The Board does not have a Compensation Committee.   Accordingly, *it is the responsibility of the entire Board* to determine the most effective total executive compensation strategy, *based upon Sonic's business needs and consistent with the shareholders' interests, to administer Sonic's executive compensation plans, programs and policies*, to monitor corporate performance and its relationship to compensation of executive officers, and to take other appropriate actions concerning matters of executive compensation. (Emphasis added).

50.   Therefore, defendants Doris, Sauer, Moorer, Child, Greber, Margugulio and Langley -- the members of Sonic's Board -- were all tasked with administering Sonic's executive compensation plans, including the grant of stock options, throughout the relevant period.

51.   The following defendants served on Sonic's Audit Committee at certain times during the relevant period:

| Audit Committee | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Director | 96 | 97 | 98 | 99 | 00 | 01 | 02 | 03 | 04 | 05 |
| Child | M | M | M | M | | | | | | |
| Marguglio | M | M | M | M | M | M | M | M | M | M |
| Greber | M | M | M | M | M | M | M | M | M | C |
| Langley | | | | | | M | M | M | M | M |
| M = Member; C= Chairman of Committee | | | | | | | | | |

52.    Sonic's Audit Committee Charter provides that the Audit Committee has, among other things, the following responsibilities:

a.    Monitor the integrity of the financial statements of Sonic;

b.    Meet with management and the independent auditor to review and discuss the annual financial statements and the report of the independent auditor thereon and, to the extent the independent auditor or management brings any such matters to the attention of the audit committee, to discuss significant issues encountered in the course of the audit work, including restrictions on the scope of activities, access to required information or the adequacy of internal controls;

c.    Meet quarterly with management and the independent auditor to review and discuss the quarterly financial statements; provided that this responsibility may be delegated to the chairman of the Audit Committee;

d.    Meet at least once each year in separate executive sessions with management and the independent auditor to discuss matters that the committee or either of these groups believes could significantly affect the financial statements and should be discussed privately;

e.    Provide minutes of Audit Committee meetings to the board of directors on any significant matters arising from the committee's work; and

f.    Prepare the report required by the rules of the SEC to be included in Sonic's annual proxy statement.

53.    As detailed in the Company's restated financial statements filed with the SEC on Form 10-K on February 26, 2008, the majority of the Company's stock option grants granted during the *period reviewed by the Audit Committee* were incorrectly accounted for, resulting in approximately *$37.7 million* in additional compensation expenses.    As such, the Audit Committee members flagrantly failed to perform their duties as mandated by the Audit Committee Charter.

CONSOLIDATED CLASS ACTION AND SHAREHOLDER DERIVATIVE COMPLAINT
Case No. C-07-1500-CW

# BACKGROUND

## The Stock Option Backdating Scandal

54.     Under accounting rules in effect prior to 2004, public companies in the United States were permitted to grant stock options to employees without recording an expense, as long as the option's strike price was at or above the stock price on the day the options were granted. If the option granted was priced below the market price on the grant date, *i.e.*, in-the-money, accounting rules required that any publicly traded company recognize and record the difference as compensation expense in its financial statements. *See* Accounting Principles Board Opinion No. 25 ("APB 25"), superseded in 2004 by FAS 123(R).

55.     Pursuant to APB 25, if the market price on the date of grant exceeds the exercise price of the options, the company must recognize the difference as an expense.

56.     Since March 18, 2006, when *The Wall Street Journal* published an article entitled "The Perfect Payday," which first revealed the unlawful practice of backdating stock options, more than 220 companies have reported internal and/or governmental investigations of their backdating practices. Additional research by Professor Erik Lie, Tippie College of Business at the University of Iowa, suggests that between 1996 and 2005, 18.9% of unscheduled option grants to top executives were backdated or manipulated by nearly one-third of the companies investigated. Indeed, like the stock option grants examined by *The Wall Street Journal*, the pattern of option grants identified at Sonic is more than randomly fortuitous, and the more likely reason for the extraordinary pattern is that the stock options were improperly backdated.

57.     Revelations of backdated stock options have been made by companies across several business sectors and geographic regions. A disproportionate number of these revelations, however, have come from technology companies in Silicon Valley, where stock options are frequently used to attract employees and increasingly lavished upon executives. Rank and file employees who received backdated options have now found themselves subject to unforeseen tax liabilities and, in some instances, barred from exercising their own vested securities. As reported by the *San Jose Mercury News*:

> Across Silicon Valley and the nation, hundreds of thousands of workers who played no role in manipulating options nonetheless could pay a price, from lost stock options and lost investment opportunities to looming tax bills. And dozens of companies have imposed indefinite "blackout" periods .... While companies struggle to restate past earnings and report current financial results.

Mark Schwanhausser, *Average Worker Takes a Hit: Tax Bill Headaches Looming For Rank-and-File*, SAN JOSE MERCURY NEWS, Jan. 29, 2007.

58.    As the scrutiny has intensified, backdating has been revealed not only as a practice to maximize the grant recipients' gain, while concealing company expenses, but also as a tax avoidance vehicle for some executives.  Reporting on an analysis written by an economist at the SEC, the San Jose Mercury News reported, "[i]n a new wrinkle in the scandal over backdating stock options, an analyst has found evidence that some executives manipulated the exercise dates of their options in order to cheat on their taxes."  Marcy Gordon, *SEC: Backdating Done to Avoid Paying More Taxes*, SAN JOSE MERCURY NEWS, Dec. 13, 2006.

## Sonic Stock Option Plans

59.    During the relevant period in which the Individual Defendants engaged in their secret scheme to backdate or otherwise manipulate the exercise price of stock options, Sonic had two stock option plans in effect: the Sonic Solutions Stock Option Plan (sometimes referred to as the "1989 Stock Plan") and the 1998 Stock Option Plan (collectively, the "Plans").

## The Sonic Solutions Stock Option Plan

60.    Under the Sonic Solutions Stock Option Plan, those eligible to receive stock option awards include "any person who is an employee, consultant, officer or director of the Company or of any Affiliate [as defined within the plan] of the Company."  Each option grant was evidenced by a stock option agreement between the Company and the employee to whom such option was granted.

61.    Under the Sonic Solutions Stock Option Plan, the Board or the Chief Executive Officer were authorized to administer the plan.  As noted above, all proxy statements regarding the Sonic Solutions Stock Option Plan stated that such administrator was the ***full Board.*** Moreover, the Sonic Solutions Stock Option Plan provided that "[t]o the extent required by Rule 16b-3, no Option shall be granted to (i) a director of the Company except by the Board when a

CONSOLIDATED CLASS ACTION AND SHAREHOLDER DERIVATIVE COMPLAINT
Case No. C-07-1500-CW

1   majority of the members of the Board, and a majority of the directors acting in the matter,

2   "disinterested persons" [as defined within the plan], or (ii) to an officer of the Company not a

3   member of the Board except by the Board."

4        62.    Furthermore, under the Sonic Solutions Stock Option Plan, the administrator of

5   the plan alone had the authority: "(i) to grant Options; (ii) to determine the fair market value of

6   the Common Stock subject to options; (iii) to determine the exercise price of options granted;

7   (iv) to determine the persons to whom, and the time or times a which Options shall be granted,

8   and the number of shares subject to each option . . . ." The administrator was required to price

9   the options granted under the Sonic Solutions Stock Option Plan at fair market value, which was

10  defined as "the closing sales price for such stock or the closing bid if no sales were reported, as

11  quoted on such system or exchange (or the largest such exchange) for the date the value is to be

12  determined . . ."[3]

13  **The 1998 Stock Option Plan**

14       63.    Under the 1998 Stock Option Plan, those eligible to receive stock option awards

15  include "any person who is an employee of the Company or of any Affiliate [as defined within

16  the plan] of the Company." Each option grant was evidenced by a stock option agreement

17  between the Company and the employee to whom such option was granted.

18       64.    Under the 1998 Plan, the Board, a Committee of the Board or the Chief Executive

19  Officer were authorized to administer the plan. As noted above, all proxy statements regarding

20  the 1998 Stock Option Plan stated that such administrator was the full Board. Moreover, the

21  1998 Stock Option Plan provided that the Chief Executive Officer could not grant options to

22  directors of the Company or executive officers of the Company as defined by the Securities and

23  Exchange Act.

24       65.    Furthermore under the 1998 Stock Option Plan, the administrator of the plan

25  alone had the authority: "(i) to grant Options; (ii) to determine the fair market value of the

26

27  _____

    [3] Under the Sonic Solutions Stock Option Plan, the exercise price for Non-qualified Stock Options must be at least

28  85% of the fair market value of the Common Stock on the date of grant.

CONSOLIDATED CLASS ACTION AND SHAREHOLDER DERIVATIVE COMPLAINT
Case No. C-07-1500-CW

1    Common Stock subject to options; (iii) to determine the exercise price of options granted; (iv) to

2    determine the persons to whom, and the time or times a which Options shall be granted, and the

3    number of shares subject to each option . . . ." The administrator was required to price the

4    options granted under the 1998 Stock Option Plan at fair market value, which was defined as

5    "the closing sales price of the Common Stock reported on the Nasdaq National Market System

6    or, if the Common Stock is not traded on the Nasdaq National Market, the fair market value of

7    the Common Stock as determined by the Administrator in good faith."[4]

8       66.     From 1995 to 2003, the Board (Doris, Sauer, Moorer, Child, Greber, Margugulio

9    and Langley) knowingly and deliberately violated the terms of the Plans and APB 25 by

10    knowingly and deliberately backdating or otherwise manipulating grants of stock options to

11    make it appear as though the grants were made on dates when the market price of Sonic stock

12    was lower than the market price on the actual grant dates, thereby unduly benefiting the

13    recipients of the backdated options.    Defendants Doris, Sauer, Moorer, Child, Greber,

14    Margugulio and Langley knew that the publicly reported grant dates and statements that the

15    Company followed APB 25 and granted options with exercise prices equal to the fair market

16    value of Sonic stock on the date of grant were false because the grants were in fact backdated or

17    otherwise granted below fair market value.    These defendants knowingly and deliberately

18    backdated or otherwise manipulated stock options with knowledge of the consequences, *e.g.*, the

19    effects on Sonic's financial statements, especially because Defendants Child, Greber,

20    Margugulio and Langley were also on the Audit Committee during the relevant period and

21    reviewed and oversaw the filing of Sonic's financial results.

22       67.     Between 1996 and 2006, defendants Doris, Sauer, Moorer, Child, Greber,

23    Margugulio and Langley repeated in proxy statements that the stock option grants made during

24    that period carried an exercise price that was equal to the fair market value on the date of grant.

25    Until 2007, these defendants concealed that Sonic option grants were repeatedly and

26

27    ───────────────

[4] Under the 1998 Stock Option Plan, the exercise price for Non-qualified Stock Options must be at least 85% of the fair market value of the Common Stock on the date of grant.

28    CONSOLIDATED CLASS ACTION AND SHAREHOLDER DERIVATIVE COMPLAINT
Case No. C-07-1500-CW

1  intentionally backdated or otherwise granted below fair market value in order to grant

2  undisclosed in-the-money options to Company insiders.  Upon information and belief, the Board

3  members (Doris, Sauer, Moorer, Child, Greber, Margugulio and Langley) who granted stock

4  option grants would review historical stock prices before issuing stock options to select a grant

5  date when the stock prices was significantly below the current market price.  They would then

6  falsify the relevant documents to make it appear as if the stock options were granted on the

7  earlier date.

8       68.    As a result, Company insiders to whom the options were granted could realize the

9  gain observed between the historical and actual grant date while the Company's records would

10  appear to show no difference between the option price and the market price on the purported date

11  of the grant, thereby avoiding both the reporting requirement and the additional compensation

12  expense.

13                          **SUBSTANTIVE ALLEGATIONS**

14         **Backdating and Other Manipulation of Sonic Stock Option Grants**

15       69.    As discussed below, 13 of the 16 (or over 81%) stock option grants made to

16  defendants between 1995 and 2003 were backdated or otherwise manipulated.[5]  A review of the

17  stock option grants to directors and top officers of Sonic between 1995 and 2003 shows that the

18  stock option grants were almost always dated: (i) near or on the very day that Sonic stock hit its

19  low price for the month or quarter; or (ii) in advance of sharp stock price increases.  The odds of

20  that happening by chance are remote.

21       70.    Sonic's pattern of stock option grants on dates with highly favorable exercise

22  prices – at or near a periodic low, or preceding a sharp increase in the share price – indicates that

23  the purported grant dates of stock options were not the actual dates on which the option grants

24  were made.  Rather, the pattern indicates that the grants were repeatedly backdated to dates with

25  exceedingly low stock prices.

26

27  [5] All of the 13 grants were discretionary grants, made absent of any fixed or prescribed scheduling arrangement.

28  CONSOLIDATED CLASS ACTION AND SHAREHOLDER DERIVATIVE COMPLAINT
   Case No. C-07-1500-CW

71.    As demonstrated below, year after year, stock options were granted at different times of the year with the only consistency being that the grants were at or near a periodic low or preceded a run-up in the share price.

### Option Grants in Fiscal Year 1995 (ended March 31, 1996)

72.    In fiscal year 1995, the Board was directly and solely responsible for the timing, pricing and granting of Sonic stock option grants.  Specifically, the Board had the sole authority to choose the date and, in fact, did choose the date on which stock options were granted.  For the purported November 21, 1995 and December 15, 1995 grants, defendants Doris, Sauer, Moorer, Child, Greber and Margugulio, as Board members, had the authority to administer the Sonic Solutions Stock Option Plan and grant stock options thereunder.

73.    Defendants Doris, Sauer, Moorer, Child, Greber and Margugulio were aware that the Sonic Solutions Stock Option Plan required that stock options be granted at not less than fair market value on the date of grant.  Defendants Doris, Sauer, Moorer, Child, Greber and Margugulio granted these grants on a date after the reported grant date and knowingly used hindsight to select a date and price when Sonic stock was at a lower price.  Defendants Doris, Sauer, Moorer, Child, Greber and Margugulio knew that backdating option grants to a date with a lower price violated the Sonic Solutions Stock Option Plan.

74.    Defendants Doris, Sauer, Moorer, Child, Greber and Margugulio granted stock options backdated to November 21, 1995 and December 15, 1995, when Sonic's common stock was at historical lows of fiscal year 1995.

75.    A graph demonstrating the timing of the grants issued on November 21, 1995 and December 15, 1995 follows below:



| Purported Date of Grant | Recipient | Number of Stock Options | Exercise Price |
|---|---|---|---|
| 11/21/95 | Leighton | 25,000 | $6.00 |
| 12/15/95 | Paulsen | 20,000 | $6.50 |
|  | Costello | 14,000 | $6.50 |

<u>November 21, 1995 Grant</u>

76.    Defendants Doris, Sauer, Moorer, Child, Greber and Margugulio purportedly granted 25,000 options to Leighton dated as of November 21, 1995 at $6.00, which coincided with Sonic's second lowest closing price of the fiscal quarter and month, as demonstrated below.

77.    Defendants Doris, Sauer, Moorer, Child, Greber and Margugulio had the sole authority to grant these options and choose the date and price and, in fact, did grant such options and chose the price and date on which these stock options were granted. Doris, Sauer, Moorer, Child, Greber and Margugulio granted these options on a date after the reported grant date and knowingly and deliberately used hindsight to pick the date and price when Sonic's stock was near its quarterly and monthly low. Doris, Sauer, Moorer, Child, Greber and Margugulio knew that the Sonic Solutions Stock Option Plan required them to use the fair market value on the actual grant date and knew that backdating to a date with a lower price violated the Sonic

1    Solutions Stock Option Plan, yet knowingly and deliberately violated the Sonic Solutions Stock

2    Option Plan.



December 15, 1995 Grant

16    78.    Defendants Doris, Sauer, Moorer, Child, Greber and Margugulio purportedly

17    granted 20,000 options to Paulsen and 14,000 options to Costello dated as of December 15, 1995

18    at $6.50, which coincided with one of Sonic's lowest closing prices of the fiscal quarter and

19    month, as demonstrated below.

20    79.    Defendants Doris, Sauer, Moorer, Child, Greber and Margugulio had the sole

21    authority to grant these options and choose the date and price and, in fact, did grant such options

22    and chose the price and date on which these stock options were granted. Doris, Sauer, Moorer,

23    Child, Greber and Margugulio granted this grant on a date after the reported grant date and

24    knowingly and deliberately used hindsight to pick the date and price when Sonic's stock was

25    near its quarterly and monthly low. Doris, Sauer, Moorer, Child, Greber and Margugulio knew

26    that the Sonic Solutions Stock Option Plan required them to use the fair market value on the

27    actual grant date and knew that backdating to a date with a lower price violated the Sonic

28

Solutions Stock Option Plan, yet knowingly and deliberately violated the Sonic Solutions Stock Option Plan.



## Option Grant in Fiscal Year 1996 (ended March 31, 1997)

80.    In fiscal year 1996, the Board was directly and solely responsible for the timing, pricing and granting of Sonic stock option grants.  Specifically, the Board had the sole authority to choose the date and, in fact, did choose the date on which stock options were granted.  For the purported July 16, 1996 grant, defendants Doris, Sauer, Moorer, Child, Greber and Margugulio, as Board members, had the authority to administer the Sonic Solutions Stock Option Plan and grant stock options thereunder.

81.    Defendants Doris, Sauer, Moorer, Child, Greber and Margugulio were aware that the Sonic Solutions Stock Option Plan required that stock options be granted at not less than fair market value on the date of grant.  Defendants Doris, Sauer, Moorer, Child, Greber and Margugulio granted these grants on a date after the reported grant date and knowingly used hindsight to select a date and price when Sonic stock was at or near yearly, quarterly or monthly lows.  Defendants Doris, Sauer, Moorer, Child, Greber and Margugulio knew that backdating option grants to a date with a lower price violated the Sonic Solutions Stock Option Plan.

1    82.    Defendants Doris, Sauer, Moorer, Child, Greber and Margugulio granted stock

2    options backdated to July 16, 1996, when Sonic's common stock was at a historical low of fiscal

3    year 1996, as demonstrated in the chart below:



15    83.    Defendants Doris, Sauer, Moorer, Child, Greber and Margugulio purportedly

16    granted 20,000 options to Leighton dated as of July 16, 1996 at $5.75, which coincided with

17    Sonic's lowest closing prices of the fiscal quarter and month, as demonstrated below.

18    84.    Defendants Doris, Sauer, Moorer, Child, Greber and Margugulio had the sole

19    authority to grant these options and choose the date and price and, in fact, did grant such options

20    and chose the price and date on which these stock options were granted. Doris, Sauer, Moorer,

21    Child, Greber and Margugulio granted this grant on a date after the reported grant date and

22    knowingly and deliberately used hindsight to pick the date and price when Sonic's stock was at

23    its quarterly and monthly low. Doris, Sauer, Moorer, Child, Greber and Margugulio knew that

24    the Sonic Solutions Stock Option Plan required them to use the fair market value on the actual

25    grant date and knew that backdating to a date with a lower price violated the Sonic Solutions

26    Stock Option Plan, yet knowingly and deliberately violated the Sonic Solutions Stock Option

27    Plan.

28

CONSOLIDATED CLASS ACTION AND SHAREHOLDER DERIVATIVE COMPLAINT
Case No. C-07-1500-CW

1
2
3
4
5
6
7
8
9
10
11



12    **Option Grant in Fiscal Year 1997 (ended March 31, 1998)**

13    85.    In fiscal year 1997, the Board was directly and solely responsible for the timing,

14    pricing and granting of Sonic stock option grants.  Specifically, the Board had the sole authority

15    to choose the date and, in fact, did choose the date on which stock options were granted.  For the

16    purported March 3, 1998 grant, defendants Doris, Sauer, Moorer, Child, Greber and Margugulio,

17    as Board members, had the authority to administer the Sonic Solutions Stock Option Plan and

18    grant stock options thereunder.

19    86.    Defendants Doris, Sauer, Moorer, Child, Greber and Margugulio were aware that

20    the Sonic Solutions Stock Option Plan required that stock options be granted at not less than fair

21    market value on the date of grant.  Defendants Doris, Sauer, Moorer, Child, Greber and

22    Margugulio granted these grants on a date after the reported grant date and knowingly used

23    hindsight to select a date and price when Sonic stock was near a yearly, quarterly or monthly

24    low.  Defendants Doris, Sauer, Moorer, Child, Greber and Margugulio knew that backdating

25    option grants to a date with a lower price violated the Sonic Solutions Stock Option Plan.

26    87.    Defendants Doris, Sauer, Moorer, Child, Greber and Margugulio granted stock

27    options backdated to March 3, 1998, when Sonic's common stock was at a historical low of

28

fiscal year 1997, as demonstrated in the chart below:



| Purported Date of Re-Pricing | Recipient | Number of Stock Options Re-Priced | Exercise Price |
|---|---|---|---|
| 3/3/98 | Doris | 175,000 | $2.5625 |
| | Sauer | 112,000 | $2.5625 |
| | Moorer | 25,000 | $2.5625 |
| | Kryzan | 100,000 | $2.5625 |
| | Leighton | 145,000 | $2.5625 |

88.    Defendants Doris, Sauer, Moorer, Child, Greber and Margugulio purportedly re-priced 175,000 options previously granted to Doris, 112,000 options previously granted to Sauer, 25,000 options previously granted to Moorer, 100,000 options previously granted to Kryzan and 145,000 options previously granted to Leighton dated as of March 3, 1998 at $2.56, which was below the fair market value of the Company's common stock on that date.  On March 3, 1998, Sonic common stock closed at $2.66 and that date coincided with one of Sonic's lowest closing prices of the fiscal quarter and month, as demonstrated below.

89.    Defendants Doris, Sauer, Moorer, Child, Greber and Margugulio had the sole

1    authority to grant these options and choose the date and price and, in fact, did grant such options

2    and chose the price and date on which these stock options were granted. Doris, Sauer, Moorer,

3    Child, Greber and Margugulio granted this grant on a date after the reported grant date and

4    knowingly and deliberately used hindsight to pick the date and price when Sonic's stock was

5    near its quarterly and monthly low. Doris, Sauer, Moorer, Child, Greber and Margugulio knew

6    that the Sonic Solutions Stock Option Plan required them to use the fair market value on the

7    actual grant date and knew that backdating to a date with a lower price, as well as granting the

8    options below the fair market value on that date, violated the Sonic Solutions Stock Option Plan,

9    yet knowingly and deliberately violated the Sonic Solutions Stock Option Plan.



### Option Grant in Fiscal Year 1998 (ended March 31, 1999)

22    90.    In fiscal year 1998, the Board was directly and solely responsible for the timing,

23    pricing and granting of Sonic stock option grants. Specifically, the Board had the sole authority

24    to choose the date and, in fact, did choose the date on which stock options were granted. For the

25    purported September 2, 1998 grant, defendants Doris, Sauer, Moorer, Child, Greber and

26    Margugulio, as Board members, had the authority to administer the 1998 Stock Option Plan and

27    grant stock options thereunder.

28

1    91.    Defendants Doris, Sauer, Moorer, Child, Greber and Margugulio were aware that

2  the 1998 Stock Option Plan required that stock options be granted at not less than fair market

3  value on the date of grant.  Defendants Doris, Sauer, Moorer, Child, Greber and Margugulio

4  granted these grants on a date after the reported grant date and knowingly used hindsight to

5  select a date and price when Sonic stock near a yearly, quarterly or monthly low.  Defendants

6  Doris, Sauer, Moorer, Child, Greber and Margugulio knew that backdating option grants to a

7  date with a lower price violated the 1998 Stock Option Plan.

8    92.    Defendants Doris, Sauer, Moorer, Child, Greber and Margugulio granted stock

9  options backdated to September 2, 1998, when Sonic's common stock was at a historical low of

10  fiscal year 1998, as demonstrated in the chart below:



| Purported Date of Grant | Recipient | Number of Stock Options | Exercise Price |
|---|---|---|---|
| 9/2/98 | Doris | 85,000 | $1.688 |
| | Sauer | 40,000 | $1.688 |
| | Kryzan | 40,000 | $1.688 |
| | Leighton | 25,000 | $1.688 |

1       93.    Defendants Doris, Sauer, Moorer, Child, Greber and Margugulio purportedly

2   granted 85,000 options to Doris, 40,000 options to Sauer, 40,000 options to Kryzan and 25,000

3   options to Leighton dated as of September 2, 1998 at $1.69, which coincided with one of Sonic's

4   lowest closing prices of the fiscal quarter and month, as demonstrated below.[6]

5       94.    Defendants Doris, Sauer, Moorer, Child, Greber and Margugulio had the sole

6   authority to grant these options and choose the date and price and, in fact, did grant such options

7   and chose the price and date on which these stock options were granted.  Doris, Sauer, Moorer,

8   Child, Greber and Margugulio granted this grant on a date after the reported grant date and

9   knowingly and deliberately used hindsight to pick the date and price when Sonic's stock was

10  near its quarterly and monthly low.  Doris, Sauer, Moorer, Child, Greber and Margugulio knew

11  that the 1998 Stock Option Plan required them to use the fair market value on the actual grant

12  date and knew that backdating to a date with a lower price violated the 1998 Stock Option Plan,

13  yet knowingly and deliberately violated the 1998 Stock Option Plan.



[6] Interestingly, the Board granted the stock options one day after the Company's Annual Meeting of Shareholders.
The Company's closing stock price on the day of the Annual Meeting of Shareholders was $1.75.  With the
exception of this grant and the September 1999 grant, the Board consistently granted September stock options on the
day of Sonic's Annual Meeting of Shareholders.
CONSOLIDATED CLASS ACTION AND SHAREHOLDER DERIVATIVE COMPLAINT
Case No. C-07-1500-CW

1  **Option Grants in Fiscal Year 1999 (ended March 31, 2000)**

2      95.    In fiscal year 1999, the Board was directly and solely responsible for the timing,

3  pricing and granting of Sonic stock option grants.  Specifically, the Board had the sole authority

4  to choose the date and, in fact, did choose the date on which stock options were granted.  For the

5  purported August 20, 1999 and September 9, 1999 grants, defendants Doris, Sauer, Child,

6  Greber and Margugulio, as Board members, had the authority to administer the 1998 Stock

7  Option Plan and grant stock options thereunder.

8      96.    Defendants Doris, Sauer, Child, Greber and Margugulio were aware that the 1998

9  Stock Option Plan required that stock options be granted at not less than fair market value on the

10  date of grant.  Defendants Doris, Sauer, Child, Greber and Margugulio granted these grants on a

11  date after the reported grant date and knowingly used hindsight to select a date and price when

12  Sonic stock was near a yearly, quarterly or monthly low.  Defendants Doris, Sauer, Child, Greber

13  and Margugulio knew that backdating option grants to a date with a lower price violated the

14  1998 Stock Option Plan.

15      97.    Defendants Doris, Sauer, Child, Greber and Margugulio granted stock options

16  backdated to August 20, 1999 and September 9, 1999, when Sonic's common stock was at

17  historical lows of fiscal year 1999, as demonstrated in the chart below:



| Purported Date of Grant | Recipient | Number of Stock Options | Exercise Price |
|---|---|---|---|
| 8/20/99 | Kryzan | 25,000 | $2.75 |
| | Leighton | 25,000 | $2.75 |
| 9/9/99 | Doris | 85,000 | $2.656 |
| | Sauer | 40,000 | $2.656 |
| | Leighton | 40,000 | $2.656 |

August 20, 1999 Grant

98.    Doris, Sauer, Child, Greber and Margugulio purportedly granted 25,000 options to Kryzan and 25,000 options to Leighton dated as of August 20, 1999 at $2.75, which coincided with one of Sonic's lowest closing prices of the fiscal quarter and month, as demonstrated below.

99.    Doris, Sauer, Child, Greber and Margugulio had the sole authority to grant these options and choose the date and price and, in fact, did grant such options and chose the price and date on which these stock options were granted.  Doris, Sauer, Child, Greber and Margugulio granted this grant on a date after the reported grant date and knowingly and deliberately used hindsight to pick the date and price when Sonic's stock was near its quarterly and monthly low. Doris, Sauer, Child, Greber and Margugulio knew that the 1998 Option Plan required them to use the fair market value on the actual grant date and knew that backdating to a date with a lower price violated the 1998 Stock Option Plan, yet knowingly and deliberately violated the 1998 Stock Option Plan.

1
2
3
4
5
6
7
8
9
10
11



<u>September 9, 1999 Grant</u>

12    100.    Doris, Sauer, Child, Greber and Margugulio, purportedly granted 85,000 options

13  to Doris, 40,000 options to Sauer and 40,000 options to Leighton dated as of September 9, 1999

14  at $2.656, which was below the fair market value of the Company's common stock on that date.

15  On September 9, 1999, Sonic common stock closed at $2.72,[7] and that date coincided with one

16  of Sonic's lowest closing prices of the fiscal quarter and month, as demonstrated below.

17    101.    Defendants Doris, Sauer, Child, Greber and Margugulio had the sole authority to

18  grant these options and choose the date and price and, in fact, did grant such options and chose

19  the price and date on which these stock options were granted.  Doris, Sauer, Child, Greber and

20  Margugulio granted this grant on a date after the reported grant date and knowingly and

21  deliberately used hindsight to pick the date and price when Sonic's stock was near its quarterly

22  and monthly low.  Doris, Sauer, Child, Greber and Margugulio knew that the 1998 Option Plan

23  required them to use the fair market value on the actual grant date and knew that backdating to a

24  date with a lower price, as well as granting the options below the fair market value on that date,

25  violated the 1998 Stock Option Plan, yet knowingly and deliberately violated the 1998 Stock

26

27  _____
[7] Sonic's common stock closed at $2.66 on September 8, 1999, the day before these stock options were purportedly
28  granted.
CONSOLIDATED CLASS ACTION AND SHAREHOLDER DERIVATIVE COMPLAINT
Case No. C-07-1500-CW

1   Option Plan.



**Option Grants in Fiscal Year 2000 (ended March 31, 2001)**

102.    In fiscal year 2000, the Board was directly and solely responsible for the timing, pricing and granting of Sonic stock option grants. Specifically, the Board had the sole authority to choose the date and, in fact, did choose the date on which stock options were granted. For the purported April 1, 2000 and September 1, 2000 grants, defendants Doris, Sauer, Greber and Margugulio, as Board members, had the authority to administer the 1998 Stock Option Plan and grant stock options thereunder.

103.    Defendants Doris, Sauer, Greber and Margugulio were aware that the 1998 Stock Option Plan required that stock options be granted at not less than fair market value on the date of grant. Defendants Doris, Sauer, Greber and Margugulio knowingly granted these options with an exercise price below fair market value. Defendants Doris, Sauer, Greber and Margugulio knew that granting options below fair market value violated the 1998 Stock Option Plan.

104.    Defendants Doris, Sauer, Greber and Margugulio granted stock options below fair market value for the dates April 1, 2000 and September 1, 2000, at an exercise price of $1.56, as demonstrated below:



| Purported Date of Grant | Name | Number of Stock Options | Exercise Price |
|---|---|---|---|
| 4/1/00 | Kryzan | 48,000 | $1.5630 |
| 9/1/00 | Leighton | 50,000 | $1.5630 |

105.    Defendants Doris, Sauer, Greber and Margugulio purportedly granted 48,000 options to Kryzan and 50,000 options to Leighton dated as of April 1, 2000 and September 1, 2000 at $1.69, which was far below the corresponding fair market value of Sonic common stock, which closed on those dates at $8.00 and $3.00, respectively.

106.    Defendants Doris, Sauer, Greber and Margugulio had the sole authority to grant these options and choose the date and price and, in fact, did grant such options and chose the price and date on which these stock options were granted. Doris, Sauer, Greber and Margugulio knowingly and deliberately granted these options with an exercise price below fair market value. Doris, Sauer, Greber and Margugulio knew that the 1998 Stock Option Plan required them to use the fair market value on the actual grant date and knew that granting stock options below fair market value violated the 1998 Stock Option Plan, yet knowingly and deliberately violated the 1998 Stock Option Plan.

**Option Grants in Fiscal Year 2001 (ended March 31, 2002)**

107.    In fiscal year 2001, the Board was directly and solely responsible for the timing, pricing and granting of Sonic stock option grants.  Specifically, the Board had the sole authority to choose the date and, in fact, did choose the date on which stock options were granted.  For the purported July 12, 2001, October 25, 2001 and December 3, 2001 grants, defendants Doris, Sauer, Greber, Langley and Margugulio, as Board members, had the authority to administer the 1998 Stock Option Plan and grant stock options thereunder.

108.    Defendants Doris, Sauer, Greber, Langley and Margugulio were aware that the 1998 Stock Option Plan required that stock options be granted at not less than fair market value on the date of grant.  Defendants Doris, Sauer, Greber, Langley and Margugulio granted these grants on a date after the reported grant date and knowingly used hindsight to select a date and price when Sonic stock was at or near yearly, quarterly and monthly lows.  Defendants Doris, Sauer, Greber, Langley and Margugulio knew that backdating option grants to a date with a lower price violated the 1998 Stock Option Plan.

109.    Defendants Doris, Sauer, Greber, Langley and Margugulio granted stock options backdated to July 12, 2001, October 25, 2001 and December 3, 2001, when Sonic's common stock was at historical lows of fiscal year 2001, as demonstrated in the chart below:



| Purported Date of Grant | Name | Number of Stock Options | Exercise Price |
|---|---|---|---|
| 7/12/01 | Doris | 90,000 | $1.12 |
| | Sauer | 90,000 | $1.12 |
| | Leighton | 40,000 | $1.12 |
| 10/25/01 | Leighton | 210,000 | $1.17 |
| 12/3/01 | Kryzan | 70,000 | $1.35 |

July 12, 2001 Grant

110.    Defendants Doris, Sauer, Greber, Langley and Margugulio purportedly granted 90,000 options to Doris, 90,000 options to Sauer and 40,000 options to Leighton dated as of July 12, 2001 at $1.12, which coincided with Sonic's lowest closing prices of the fiscal quarter and month, as demonstrated below.

111.    Defendants Doris, Sauer, Greber, Langley and Margugulio had the sole authority to grant these options and choose the date and price and, in fact, did grant such options and chose the price and date on which these stock options were granted. Doris, Sauer, Greber, Langley and Margugulio granted this grant on a date after the reported grant date and knowingly and deliberately used hindsight to pick the date and price when Sonic's stock was near its quarterly and monthly low. Doris, Sauer, Greber, Langley and Margugulio knew that the 1998 Option Plan required them to use the fair market value on the actual grant date and knew that backdating to a date with a lower price violated the 1998 Stock Option Plan, yet knowingly and deliberately violated the 1998 Stock Option Plan.



October 25, 2001 Grant

112.    Doris, Sauer, Greber, Langley and Margugulio purportedly granted 210,000 options to Leighton dated as of October 25, 2001 at $1.17, which coincided with one of Sonic's lowest closing prices of the fiscal quarter and month, as demonstrated below.

113.    Doris, Sauer, Greber, Langley and Margugulio had the sole authority to grant these options and choose the date and price and, in fact, did grant such options and chose the price and date on which these stock options were granted.  Doris, Sauer, Greber, Langley and Margugulio granted this grant on a date after the reported grant date and knowingly and deliberately used hindsight to pick the date and price when Sonic's stock was near its quarterly and monthly low.  Doris, Sauer, Greber, Langley and Margugulio knew that the 1998 Option Plan required them to use the fair market value on the actual grant date and knew that backdating to a date with a lower price violated the 1998 Stock Option Plan, yet knowingly and deliberately violated the 1998 Stock Option Plan.

1
2
3
4
5
6
7
8
9
10
11



December 3, 2001 Grant

12
13
14
15
16

114.   Defendants Doris, Sauer, Greber, Langley and Margugulio purportedly granted 70,000 options to Kryzan dated as of December 3, 2001 at $1.35, which coincided with one of Sonic's lowest closing prices of the fiscal quarter and month and immediately preceded a significant rise in the Company's stock price, as demonstrated below.

17
18
19
20
21
22
23
24

115.   Defendants Doris, Sauer, Greber, Langley and Margugulio had the sole authority to grant these options and choose the date and price and, in fact, did grant such options and chose the price and date on which these stock options were granted. Doris, Sauer, Greber, Langley and Margugulio granted this grant on a date after the reported grant date and knowingly and deliberately used hindsight to pick the date and price when Sonic's stock was near its quarterly and monthly low. Doris, Sauer, Greber, Langley and Margugulio knew that the 1998 Option Plan required them to use the fair market value on the actual grant date and knew that backdating to a date with a lower price violated the 1998 Stock Option Plan, yet knowingly and deliberately violated the 1998 Stock Option Plan.

25
26
27
28



116.    Each and every one of the aforementioned stock option grants were dated just before a significant increase in Sonic's stock price, near or at Sonic's lowest closing stock price of the pertinent month, fiscal quarter and/or fiscal year and/or substantially below the fair market value of Sonic common stock for the date on which the options were purportedly granted. The reason for the extraordinary pattern set forth in the preceding paragraphs is that the purported grant dates set forth therein were not the actual dates on which the stock option grants were made. Rather, as the behest of the option recipients (defendants Doris, Sauer, Leighton, Paulsen, Costello, Moorer and Kryzan), Board members Doris, Sauer, Moorer, Child, Greber, Langley and Margugulio, knowingly and deliberately backdated the stock option grants to make it appear as though the grants were made on dates when the market price of Sonic's stock was lower than the market price on the actual grant dates.

117.    Defendants Doris, Sauer, Moorer, Child, Greber, Langley and Margugulio were all aware that the stock option plans required that stock options be granted at not less than fair market value on the date of grant. Furthermore, Defendants knew that backdating option grants to a date with a lower price violated the Company's stock option plans and caused the Company's financial statements to violate GAAP.

1    118.    This improper backdating, which violated the terms of the Plans, resulted in

2    option grants with lower exercise prices, which improperly increased the value of the options to

3    defendants Doris, Sauer, Leighton, Paulsen, Costello, Moorer and Kryzan and improperly

4    reduced the amounts they had to pay the Company upon exercise of the options.

5    119.    As a direct and proximate result of Defendants' misconduct, the Company has

6    sustained millions of dollars in damages, including, but not limited to, the additional

7    compensation expenses and tax liabilities the Company was required to incur; the loss of funds

8    the Company should have received when the Defendants exercised their options at improperly

9    low exercise prices instead of the higher exercise prices the options should have carried; and

10    costs and expenses incurred in connection with Sonic's internal investigation and the restatement

11    of historical financial statements.

12    ### The Sarbanes-Oxley Act of 2002 ("SOX")

13    120.    Prior to the enactment of SOX, the Individual Defendants were able to engage in

14    the backdating of stock option grants with relative ease because under federal law they were only

15    required to report stock option grants to the SEC once a year.

16    121.    Twelve out of the fourteen pre-SOX stock option grants[8] disclosed in the

17    Company's proxy statements and Forms 4 were dated to coincide with grant dates when the

18    Company's stock was trading at a particularly low price, immediately following significant

19    declines, preceding significant increases in the Company's stock price, and/or below fair market

20    value, which is strongly indicative of backdating.

21    122.    Pursuant to SOX, beginning on August 29, 2002, executives and directors were

22    required to report stock option grants to the SEC within two days of the grant.  With this new

23    reporting requirement in place, the pervasive stock option backdating pattern seen previously

24    from 1995 to 2002 for the most part came to an end, with one notable exception.  According to

25    the Company's July 29, 2003 proxy statement, the Board purportedly granted 100,000 stock

26

27    ---
[8] The two grants on September 5, 2000 and September 4, 2001 that were not backdated were presumably granted
automatically on the day of the Company's Annual Meeting of Shareholders.

28    CONSOLIDATED CLASS ACTION AND SHAREHOLDER DERIVATIVE COMPLAINT
Case No. C-07-1500-CW

-39-

1    options to Leighton on March 11, 2003 at an exercise price of $3.97, the lowest closing stock

2    price of the month.  Notwithstanding SOX's explicit two-day reporting requirement, Leighton

3    did not report his March 11, 2003 stock option grant as required under SOX.

4                    **Option Grants in Fiscal Year 2002 (ended March 31, 2003)**

5          123.    In fiscal year 2002, the Board was directly and solely responsible for the timing,

6    pricing and granting of Sonic stock option grants.  Specifically, the Board had the sole authority

7    to choose the date and, in fact, did choose the date on which stock options were granted.  For the

8    purported March 11, 2003 grant, defendants Doris, Sauer, Greber, Langley and Margugulio, as

9    Board members, had the authority to administer the 1998 Stock Option Plan and grant stock

10   options thereunder.

11         124.    Defendants Doris, Sauer, Greber, Langley and Margugulio were aware that the

12   1998 Stock Option Plan required that stock options be granted at not less than fair market value

13   on the date of grant.  Defendants Doris, Sauer, Greber, Langley and Margugulio granted these

14   grants on a date after the reported grant date and knowingly used hindsight to select a date and

15   price when Sonic stock was at or near yearly, quarterly or monthly lows.  Defendants Doris,

16   Sauer, Greber, Langley and Margugulio knew that backdating option grants to a date with a

17   lower price violated the 1998 Stock Option Plan.

18         125.    Defendants Doris, Sauer, Greber, Langley and Margugulio granted stock options

19   backdated to March 11, 2003 when Sonic's common stock was at historical lows of fiscal year

20   2002, as demonstrated in the chart below:

21

22

23

24

25

26

27

28   CONSOLIDATED CLASS ACTION AND SHAREHOLDER DERIVATIVE COMPLAINT
     Case No. C-07-1500-CW

1
2
3
4
5
6
7
8
9
10



11   126.   Defendants Doris, Sauer, Greber, Langley and Margugulio purportedly granted

12  100,000 options to Leighton dated as of March 11, 2003 at $3.97, which coincided with one of

13  Sonic's lowest closing prices of the fiscal quarter and month, as demonstrated below.

14   127.   Doris, Sauer, Greber, Langley and Margugulio had the sole authority to grant

15  these options and choose the date and price and, in fact, did grant such options and chose the

16  price and date on which these stock options were granted. Doris, Sauer, Greber, Langley and

17  Margugulio granted this grant on a date after the reported grant date and knowingly and

18  deliberately used hindsight to pick the date and price when Sonic's stock was near its quarterly

19  and monthly low. Doris, Sauer, Greber, Langley and Margugulio knew that the 1998 Stock

20  Option Plan required them to use the fair market value on the actual grant date and knew that

21  backdating to a date with a lower price violated the 1998 Stock Option Plan, yet knowingly and

22  deliberately violated the 1998 Stock Option Plan.

23
24
25
26
27
28

128.    In a report released on October 20, 2006, the research firm of Glass, Lewis & Co. conducted an extensive study surrounding the belief that late Form 4 filings can be one of the signs of post-SOX stock option backdating (the "Glass Lewis Report").  Specifically, according to the Glass Lewis Report, the research firm noted that "when we find late Form 4 filings where the price of the underlying stock increased materially between the purported grant date and the day the Form 4 was filed, we believe this raises legitimate questions about whether the grant was backdated."

## Statistical Analysis of Option Grants

129.    The subject of options backdating has been the focus of numerous financial analysts and experts.  As a result, a number of courts have used a statistical methodology set forth in a May 2006 report by Merrill & Co., Inc. ("Merrill Lynch"), entitled *"Options Pricing – Hindsight is 20/20"* to determine the likelihood of backdating (the "Merrill Lynch Analysis").[9]

---

[9] *See, e.g., Ryan v. Gifford*, 918 A.2d 341, 354-55 (Del. Ch. 2007)(accepting Merrill Lynch's analysis of stock options granted by a public company as indicative of backdating at the pleading stage); *Conrad v. Blank*, 2007 WL 2593540 (Del. Ch. 2007)("Here, [plaintiff] has done the same analysis [performed by Merrill Lynch]…it is sufficient that the plaintiff presented this court with the same statistical methods and similar aberrant option returns as those alleged in *Ryan*."); *Edmonds v. Getty.*, 524 F. Supp. 2d 1267, 1271 (W.D. Wash. Dec. 5, 2007)(court denied defendants' motion to dismiss for failure to make a demand and noted that the plaintiff had sufficiently alleged facts supporting an inference of backdating, which included a 20-day Merrill Lynch analysis).

CONSOLIDATED CLASS ACTION AND SHAREHOLDER DERIVATIVE COMPLAINT
Case No. C-07-1500-CW

1    130.   The Merrill Lynch Analysis measures the aggressiveness of timing of option

2    grants by examining the extent to which the stock price performance subsequent to options

3    pricing events diverges from stock performance over a longer period of time.

4    131.   First, the Merrill Lynch Analysis calculates the twenty-day performance of each

5    option grant reported in a company's proxy statements during the relevant backdating period.

6    The Analysis then calculates the annualized return of the option grants at twenty days after the

7    grant and compares that annualized return with investors' overall annualized return during the

8    same calendar year.

9    132.   Plaintiffs conducted a similar statistical analysis of the publicly-reported stock

10    option grants from 1995 to 2003.[10]  Application of the Merrill Lynch Analysis for each of the

11    discretionary grants made to Defendants supports the inference that the grants were backdated.

12    As detailed below, the grants show an astonishingly high and disproportionate return to

13    management, a hallmark of backdating.

14    133.   In total, the average annualized return to management on the option grants at

15    Sonic identified in the relevant proxy statements for calendar years 1995 to 2003 is 637%, as

16    compared to 31% average annualized return to investors – *a difference of 606%.*  In other words,

17    during the period from 1995 to 2003, backdated grants issued to Sonic insiders outperformed

18    returns on common stock owned by ordinary investors by *more than twenty times* .

19    134.   Given the vast discrepancies between the annualized management and annualized

20    investors returns, there is a very low probability that the observed stock option grants were

21

22    ───────────────
[10]   Plaintiffs examined the twenty-day returns of each stock option grant.  The twenty-day returns for all grants
23    made during each individual year were averaged and then annualized to represent what the twenty-day return would
correspond to for an entire year.  The average annualized returns for each year during the relevant period were then
24    averaged and compared to the average of an investor's annual return for each year over the relevant period.  As the
Merrill Lynch Analysis calculates management's annualized return for option grants for the calendar year, that
25    method was used despite the fact that Sonic operates on a fiscal year that ends March 31.  Additionally, as described
in greater herein, Sonic repriced previously granted stock options on March 3, 1998.  As many of these option grants
26    had never previously been disclosed in any of the Company's proxy statements, the Merrill Lynch Analysis
performed by Plaintiffs only accounts for the March 3, 1998 repriced grant date as disclosed in the Company's 1998
27    proxy statement.

28
CONSOLIDATED CLASS ACTION AND SHAREHOLDER DERIVATIVE COMPLAINT
Case No. C-07-1500-CW

1   selected by chance.  Thus, the Merrill Lynch Analysis supports the inference that Sonic stock

2   options were opportunistically granted to Company insiders in order to provide them with greater

3   financial gains on their Sonic stock options than were achieved in the open market.

4                   **Sonic's Failure to Hold a Timely Annual Meeting of Shareholders**

5        135.    The Individual Defendants continued to conceal their backdating scheme and

6   keep the Company's shareholders in the dark by failing to hold an annual shareholders meeting

7   since November 11, 2005.  Pursuant to Cal. Corp. Code § 600(c), "[i]f there is a failure to hold

8   the annual meeting for a period of 60 days after the date designated therefor or, if no date has

9   been designated, for a period of 15 months after the organization of the corporation or after its

10  last annual meeting, the superior court of the proper county may summarily order a meeting to be

11  held upon the application of any shareholder after notice to the corporation giving it an

12  opportunity to be heard."  The Individual Defendants' failure to hold an annual meeting for more

13  than 29 months following the Company's last annual meeting of the shareholders is a violation

14  of the California Corporations Code.

15                          **Sonic's Backdating Scheme Comes to Light**

16       136.    On February 1, 2007, Sonic announced that the Company was investigating its

17  historical stock option granting practices.  The review was purportedly conducted by the Audit

18  Committee of the Board.  Specifically, the Company stated, in relevant part:

19              Sonic Solutions® (NASDAQ: SNIC), the world leader in digital
                media software, announced today that it has commenced a
20              voluntary review of its historical and current stock option grant
                practices and related accounting. The review was initiated by
21              management and is being conducted by the audit committee of the
                board of directors, comprised solely of independent directors, with
22              the assistance of independent legal counsel. The audit committee
                and Company management have been discussing this ongoing
23              review with the Company's independent auditors and have
                voluntarily informed the Securities and Exchange Commission of
24              the review.

25              ***Based on the review to date, the audit committee and Company
                management have preliminarily concluded that, under applicable***
26              ***accounting guidance, the Company lacks sufficient
                documentation for certain historical option grants and that the***
27              ***measurement dates associated with these option grants may need
                to be adjusted.*** Based also on this review, the Company believes

28  CONSOLIDATED CLASS ACTION AND SHAREHOLDER DERIVATIVE COMPLAINT
    Case No. C-07-1500-CW

                                                                                        -44-

that its current options granting practices are generally acceptable and meet relevant standards for properly documenting grant dates…

137.    Over a year later, on February 26, 2008, Sonic filed with the SEC on Form 10-K the Company's restated financial statements and disclosed the conclusions of the Audit Committee investigation. The Company announced that "a substantial number of stock options granted during the Review Period were not correctly accounted for in accordance with accounting principles generally accepted in the United States applicable at the time those grants were made." As a result, the Company recorded a net expense, before taxes, of *$37.7 million* for fiscal years ended March 31, 1998 through March 31, 2006 and the six months ended September 30, 2006.

138.    Specifically, the Company stated, in relevant part:

The Audit Committee and its advisors conducted an extensive review of our historical stock option grant practices and related accounting, including an assessment and review of our options granting policies and procedures, internal records, supporting documentation and e-mail communications, as well as interviews of Company personnel. *The review focused on the period from March 3, 1998, when we engaged in a general repricing of our then-outstanding underwater options, through the present* (the "Review Period").

\*        \*        \*

Based on the results of the review, *we have concluded that a substantial number of stock options granted during the Review Period were not correctly accounted for in accordance with accounting principles generally accepted in the United States applicable at the time those grants were made*. As a result, we are restating our historical financial statements to record adjustments for additional share-based compensation expense relating to past stock option grants in accordance with Statement of Financial Accounting Standards ("SFAS") No. 123R (revised 2004), "Share-Based Payment," and Accounting Principles Board Opinion ("APB") No. 25, "Accounting for Stock Issued to Employees," and related payroll taxes, penalties, and other related amounts, to record additional share-based compensation expense associated with options granted to consultants and to record additional adjustments that were previously considered to be immaterial.

1    139.    The same day, on February 26, 2008, the Company announced that Sonic's

2    current CFO, Defendant Leighton, had been stripped of his title of CFO and was "appointed" as

3    the Company's Chief Operating Officer the day before, on February 25, 2008.    Further, the

4    Company announced that Paul F. Norris, the Company's General Counsel, was acting as the

5    Company's interim CFO.

6    140.    Inexplicably, despite Sonic's admissions of improper backdating, Sonic's Audit

7    Committee simultaneously found "no intentional misconduct" by any current officers or

8    directors.    On February 26, 2008, the Company announced that "the Audit Committee did not

9    find evidence that the officers or directors with responsibility for administration of our stock

10    option programs had taken steps to provide themselves with options at better prices than those

11    granted to other employees." The Company's announcement also noted that:

> After reviewing the available documentary evidence and
> information gathered through interviews of Company personnel,
> the Audit Committee concluded that the conduct of those who
> administered our options plans was not intentionally or knowingly
> wrongful. Specifically, the Audit Committee did not find any
> evidence that officers, employees, or directors of the Company had
> any knowledge that their handling of option grants violated stock
> option accounting rules during the Review Period. To the extent
> Sonic personnel authorized grants using incorrect or unreliable
> dates, the Audit Committee found no evidence of an intent to
> purposefully circumvent stock option accounting rules or to
> otherwise inaccurately report the financial results of the Company
> during the Review Period. Moreover, the Audit Committee found
> no indication of intent by those with responsibility for selecting
> grant dates to benefit personally at the expense of the Company.
> No Company personnel stated that they observed management
> back-date grants or commit other misconduct. Moreover, there
> were no documents indicating an intent to violate known
> accounting rules, or indicating any knowledge of misconduct in
> that regard.

25    141.    Of course, these contradictory statements cannot be reconciled with the

26    Company's own admissions of backdating and the large financial restatement that resulted from

27    the improper backdating, or Defendant Leighton's apparent demotion.

28

1    142.    In addition, the Audit Committee's conclusions that there was "no intentional

2  misconduct" and "no intent to deceive" are suspect for at least two additional reasons. First, the

3  members of the Audit Committee (Defendants Greber, Marguglio and Langley) who performed

4  the review of the Company's stock option granting policies are substantially likely to be held

5  liable for flagrantly breaching their fiduciary duties.    Thus, they lack the necessary

6  disinterestedness to adequately assess their own and the other Individual Defendants' culpability.

7  Second, the Audit Committee review only evaluated grants after March 3, 1998, more than *two*

8  *and a half years* after the practice of backdating stock options had been occurring at the

9  Company.

10    **False Financial Statements and Concealment of Misconduct**

11    143.    As a result of the Individual Defendants' backdating or other manipulation of

12  stock options, the Individual Defendants caused the Company to issue materially false and

13  misleading financial statements and reports, including but not limited to annual reports, filed

14  with the SEC and disseminated to shareholders and the public as Forms 10-K; proxy statements,

15  filed with the SEC and disseminated to shareholders and the public as Forms DEF-14A; and

16  other quarterly and interim reports.

17    144.    As detailed above, the fact that Sonic has announced the need to revised and

18  restated its downward its net income is an admission that the financial statements originally

19  issued were false when they were reported and that the misstatements were material.

20    145.    On May 26, 2006, Forbes, in an article titled, "The Next Big Scandal," quoted

21  Former SEC Chairman Harvey L. Pitt, as saying "[w]hat's so terrible about backdating options

22  grants?  For one thing, it likely renders a company's proxy materials false and misleading.

23  Proxies typically indicate that options are granted at fair market value.  But if the grant is

24  backdated, the options value isn't fair – at least not from the vantage point of the company and

25  its shareholders."

26    146.    Further, on July 22, 2006, *The San Francisco Chronicle* recounted SEC Chairman

27  Christopher Cox's announcement in San Francisco on July 20, 2006 where he said, "[backdating

28  CONSOLIDATED CLASS ACTION AND SHAREHOLDER DERIVATIVE COMPLAINT
Case No. C-07-1500-CW

-47-

1  in many cases] makes a hash of (companies') financial statements . . . [and is] poisonous [to

2  efficient markets]. . . . It is securities fraud if you falsify books and records. It is securities fraud

3  if you present financial statements to the SEC that do not comply with generally accepted

4  accounting principles. There is no requirement that (the defendant) personally profit [to prove

5  that a crime occurred.]"    The Individual Defendants prepared, approved and/or signed Sonic's

6  annual and quarterly SEC reports during the relevant period.    The Individual Defendants

7  knowingly and deliberately caused the Company to disseminate materially false and misleading

8  statements in the periodic filings that the Individual Defendants prepared, approved and/or

9  signed.

10                                    **False Proxy Statements**

11        147.    Sonic's proxy statements that were disseminated to shareholders by the Board

12  annually in connection with the annual shareholders' meeting typically concerned the election of

13  directors, the approval and adoption of Sonic's stock option plans, the authorization to reserve

14  shares for future issuance under the stock option plan, and the ratification of the selection of

15  Sonic's auditor. Each proxy statement disseminated to shareholders during this period contained

16  materially false and misleading disclosures or omitted information about Sonic's stock option

17  practices, as detailed herein.

18        148.    Moreover, the Board prepared, approved and/or signed Sonic's annual and

19  quarterly SEC reports, as specified herein, during the relevant period. The Board knowingly and

20  deliberately caused the Company to disseminate materially false and misleading statements in

21  the periodic filings that the Individual Defendants prepared, approved, and/or signed. The Board

22  knew that these statements were false and knowingly participated in their dissemination.

23        149.    As a result of the improper backdating of stock option grants, the Company, with

24  the knowledge, approval and participation of the Individual Defendants:

25              a.    violated the terms of the Company's shareholder approved stock
                      option Plans by granting stock options with exercise prices less
26                    than the fair market value of the stock on the actual date of grant;

27              b.    violated GAAP by failing to recognize compensation expenses
                      incurred when the improperly backdated and otherwise
28  CONSOLIDATED CLASS ACTION AND SHAREHOLDER DERIVATIVE COMPLAINT
    Case No. C-07-1500-CW

manipulated stock options were granted;

c.    violated Section 162(m) by taking tax deductions based on stock option grants that were not payable solely on account of the attainment of one or more performance goals and violated the terms of the Company's shareholder approved stock option plans; and

d.    produced and disseminated to Sonic shareholders and the market false financial statements that improperly recorded and accounted for the backdated stock option grants, and thereby understated compensation expenses and overstated net income or understated net loss.

150.    The Reports of the Board Regarding Executive Compensation in the Company's proxy statements filed between 1996 and 2003, falsely stated that its executive compensation program was designed to "emphasize sustained performance by aligning rewards with shareholder interests" and "motivate executives and employees to achieve Sonic's annual and long-term business goals and encourage behavior toward the fulfillment of those objectives," when, in fact, the executives received instant profits regardless of whether the Company achieved its objectives.

July 29, 1996 Proxy Statement

151.    On July 29, 1996, the Board, with the effect of concealing the improper option backdating, filed with the SEC and disseminated to Sonic's shareholders the 1996 Proxy Statement, which provided, among other things, notice of and information for Sonic's annual shareholders' meeting to be held September 3, 1996. The 1996 Proxy Statement falsely reported November 21, 1995 and December 15, 1995 as the date of stock option grants to Defendants Leighton and Paulsen, respectively, and stated that the exercise prices of the options issued to the Defendants Leighton and Paulsen were "equal to the fair market value of the Company's Common Stock on the date of grant, as determined by reference to the closing price of the Company's Common Stock on the NASDAQ National Market." These statements were materially false and misleading in light of the backdating alleged herein.

152.    The 1996 Proxy Statement failed to report the true value of the compensation paid to Defendants Leighton and Paulsen or that the options were backdated as alleged herein, rather

1    than issued on the date at which the stock traded at the market value identified in the proxy

2    statement. Thus, backdated stock options provided undisclosed compensation to the executive

3    officers on the date of the grant.

4        153.  Defendants Doris, Sauer, Moorer, Child, Greber and Margugulio knowingly

5    issued the false statements in the 1996 Proxy Statement and knew that the 1996 Proxy Statement

6    was false and misleading because the option grants were backdated.

7    July 29, 1997 Proxy Statement

8        154.  On July 29, 1997, the Board, with the effect of concealing the improper option

9    backdating, filed with the SEC and disseminated to Sonic's shareholders the 1997 Proxy

10   Statement, which provided, among other things, notice of and information for Sonic's annual

11   shareholders' meeting to be held September 2, 1997. The 1997 Proxy Statement falsely reported

12   July 16, 1996 as the date of the stock option grant to Defendant Leighton, and stated that the

13   exercise price of the options issued to Defendant Leighton was "equal to the fair market value of

14   the Company's Common Stock on the date of grant, as determined by reference to the closing

15   price of the Company's Common Stock on the NASDAQ National Market." These statements

16   were materially false and misleading in light of the backdating alleged herein.

17       155.  The 1997 Proxy Statement failed to report the true value of the compensation paid

18   to Defendant Leighton or that the options were backdated as alleged herein, rather than issued on

19   the date at which the stock traded at the market value identified in the proxy statement. Thus,

20   backdated stock options provided undisclosed compensation to the executive officers on the date

21   of the grant.

22       156.  Defendants Doris, Sauer, Moorer, Child, Greber and Margugulio knowingly

23   issued the false statements in the 1997 Proxy Statement and knew that the 1997 Proxy Statement

24   was false and misleading because the option grants were backdated.

25   July 21, 1998 Proxy Statement

26       157.  On July 21, 1998, the Board, with the effect of concealing the improper option

27   backdating or other manipulation, filed with the SEC and disseminated to Sonic's shareholders

28   CONSOLIDATED CLASS ACTION AND SHAREHOLDER DERIVATIVE COMPLAINT
     Case No. C-07-1500-CW

1    the 1998 Proxy Statement, which provided, among other things, notice of and information for

2    Sonic's annual shareholders' meeting to be held September 1, 1998. The 1998 Proxy Statement

3    falsely reported March 3, 1998 of the stock option grants which were re-priced for Defendants

4    Doris, Sauer, Moorer, Kryzan and Leighton, and stated that the exercise price of the options

5    issued to Defendants Doris, Sauer, Moorer, Kryzan and Leighton were "equal to the fair market

6    value of the Company's Common Stock on the date of grant, as determined by reference to the

7    closing price of the Company's Common Stock on the NASDAQ National Market." These

8    statements were materially false and misleading in light of the backdating alleged herein and the

9    fact that these options were granted below fair market value as alleged herein.

10        158.    The 1998 Proxy Statement failed to report the true value of the compensation paid

11    to Defendants Doris, Sauer, Moorer, Kryzan and Leighton or that the options were backdated as

12    alleged herein, rather than issued on the date at which the stock traded at the market value

13    identified in the proxy statement. Thus, backdated stock options provided undisclosed

14    compensation to the executive officers on the date of the grant.

15        159.    Defendants Doris, Sauer, Moorer, Child, Greber and Margugulio knowingly

16    issued the false statements in the 1998 Proxy Statement and knew that the 1998 Proxy Statement

17    was false and misleading because the option grants were backdated and granted below fair

18    market value.

19    July 27, 1999 Proxy Statement

20        160.    On July 27, 1999, the Board, with the effect of concealing the improper option

21    backdating, filed with the SEC and disseminated to Sonic's shareholders the 1999 Proxy

22    Statement, which provided, among other things, notice of and information for Sonic's annual

23    shareholders' meeting to be held September 7, 1999. The 1999 Proxy Statement falsely reported

24    September 2, 1998 as the date of the stock option grants to Defendants Doris, Sauer, Kryzan and

25    Leighton, and stated that the exercise price of the options issued to Defendants Doris, Sauer,

26    Kryzan and Leighton were "equal to the fair market value of the Company's Common Stock on

27    the date of grant, as determined by reference to the closing price of the Company's Common

28

CONSOLIDATED CLASS ACTION AND SHAREHOLDER DERIVATIVE COMPLAINT
Case No. C-07-1500-CW

1  Stock on the NASDAQ National Market." These statements were materially false and
2  misleading in light of the backdating alleged herein.

3      161. The 1999 Proxy Statement failed to report the true value of the compensation paid
4  to Defendants Doris, Sauer, Kryzan and Leighton or that the options were backdated as alleged
5  herein, rather than issued on the date at which the stock traded at the market value identified in
6  the proxy statement. Thus, backdated stock options provided undisclosed compensation to the
7  executive officers on the date of the grant.

8      162. Defendants Doris, Sauer, Child, Greber and Margugulio knowingly issued the
9  false statements in the 1999 Proxy Statement and knew that the 1999 Proxy Statement was false
10  and misleading because the option grants were backdated.

11  July 31, 2000 Proxy Statement

12      163. On July 31, 2000, the Board, with the effect of concealing the improper option
13  backdating or other option manipulation, filed with the SEC and disseminated to Sonic's
14  shareholders the 2000 Proxy Statement, which provided, among other things, notice of and
15  information for Sonic's annual shareholders' meeting to be held September 5, 2000. The 2000
16  Proxy Statement falsely reported August 20, 1999 and September 9, 1999 as the date of the stock
17  option grants to Defendants Kryzan and Leighton and Doris, Sauer and Leighton, respectively,
18  and stated that the exercise price of the options issued to Defendants Doris, Sauer, Kryzan and
19  Leighton were "equal to the fair market value of the Company's Common Stock on the date of
20  grant, as determined by reference to the closing price of the Company's Common Stock on the
21  NASDAQ National Market." These statements were materially false and misleading in light of
22  the backdating alleged herein and the fact that the September 9, 1999 options were granted below
23  fair market value as alleged herein.

24      164. The 2000 Proxy Statement failed to report the true value of the compensation paid
25  to Defendants Doris, Sauer, Kryzan and Leighton or that the options were backdated as alleged
26  herein, rather than issued on the date at which the stock traded at the market value identified in
27  the proxy statement. Thus, backdated stock options provided undisclosed compensation to the

28  CONSOLIDATED CLASS ACTION AND SHAREHOLDER DERIVATIVE COMPLAINT
   Case No. C-07-1500-CW

1    executive officers on the date of the grant.

2        165.    Defendants Doris, Sauer, Greber and Margugulio knowingly issued the false

3    statements in the 2000 Proxy Statement and knew that the 2000 Proxy Statement was false and

4    misleading because the option grants were backdated and/or granted below fair market value.

5    July 24, 2001 Proxy Statement

6        166.    On July 24, 2001, the Board, with the effect of concealing the improper option

7    granting, filed with the SEC and disseminated to Sonic's shareholders the 2001 Proxy Statement,

8    which provided, among other things, notice of and information for Sonic's annual shareholders'

9    meeting to be held September 4, 2001.  The 2001 Proxy Statement falsely reported that stock

10   options granted on April 1, 2000 and September 1, 2000 to Defendants Kryzan and Leighton,

11   respectively, were granted at fair market value by stating that the exercise price of the options

12   issued to Defendants Kryzan and Leighton were "equal to the fair market value of the

13   Company's Common Stock on the date of grant, as determined by reference to the closing price

14   of the Company's Common Stock on the NASDAQ National Market."  These statements were

15   materially false and misleading in light of the fact that these options were granted below fair

16   market value as alleged herein.

17       167.    The 2001 Proxy Statement failed to report the true value of the compensation paid

18   to Defendants Kryzan and Leighton or that the options were granted below fair market value as

19   alleged herein, rather than issued at an exercise price which did not corresponded to the

20   Company's common stock's market value on the date of grant, as identified in the proxy

21   statement.  Thus, improperly granted stock options provided undisclosed compensation to the

22   executive officers on the date of the grant.

23       168.    Defendants Doris, Sauer, Greber, Langley and Margugulio knowingly issued the

24   false statements in the 2001 Proxy Statement and knew that the 2001 Proxy Statement was false

25   and misleading because the option grants were granted below fair market value.

26   July 25, 2002 Proxy Statement

27       169.    On July 25, 2002, the Board, with the effect of concealing the improper option

28   CONSOLIDATED CLASS ACTION AND SHAREHOLDER DERIVATIVE COMPLAINT
     Case No. C-07-1500-CW

1    backdating, filed with the SEC and disseminated to Sonic's shareholders the 2002 Proxy

2    Statement, which provided, among other things, notice of and information for Sonic's annual

3    shareholders' meeting to be held September 3, 2002. The 2002 Proxy Statement falsely reported

4    July 12, 2001, October 25, 2001 and December 3, 2001 as the date of the stock option grants to

5    Defendants Doris, Sauer and Leighton, Leighton and Kryzan, respectively, and stated that the

6    exercise price of the options issued to Defendants Doris, Sauer, Kryzan and Leighton were

7    "equal to the fair market value of the Company's Common Stock on the date of grant, as

8    determined by reference to the closing price of the Company's Common Stock on the NASDAQ

9    National Market." These statements were materially false and misleading in light of the

10   backdating alleged herein.

11       170.   The 2002 Proxy Statement failed to report the true value of the compensation paid

12   to Defendants Doris, Sauer, Kryzan and Leighton or that the options were backdated as alleged

13   herein, rather than issued on the date at which the stock traded at the market value identified in

14   the proxy statement. Thus, backdated stock options provided undisclosed compensation to the

15   executive officers on the date of the grant.

16       171.   Defendants Doris, Sauer, Greber, Langley and Margugulio knowingly issued the

17   false statements in the 2002 Proxy Statement and knew that the 2002 Proxy Statement was false

18   and misleading because the option grants were backdated.

19   July 29, 2003 Proxy Statement

20       172.   On July 29, 2003, the Board, with the effect of concealing the improper option

21   backdating, filed with the SEC and disseminated to Sonic's shareholders the 2003 Proxy

22   Statement, which provided, among other things, notice of and information for Sonic's annual

23   shareholders' meeting to be held September 2, 2003. The 2003 Proxy Statement falsely reported

24   March 11, 2003 as the date of the stock option grant to Defendant Leighton, and stated that the

25   exercise price of the options issued to Defendant Leighton was "equal to the fair market value of

26   the Sonic's common stock on the date of grant, as determined by reference to the closing price of

27   the Sonic's common stock on the NASDAQ National Market." These statements were

28
CONSOLIDATED CLASS ACTION AND SHAREHOLDER DERIVATIVE COMPLAINT
Case No. C-07-1500-CW

1    materially false and misleading in light of the backdating alleged herein.

2        173.    The 2003 Proxy Statement failed to report the true value of the compensation paid

3    to Defendant Leighton or that the options were backdated as alleged herein, rather than issued on

4    the date at which the stock traded at the market value identified in the proxy statement. Thus,

5    backdated stock options provided undisclosed compensation to the executive officers on the date

6    of the grant.

7        174.    Defendants Doris, Sauer, Greber, Langley and Margugulio knowingly issued the

8    false statements in the 2003 Proxy Statement and knew that the 2003 Proxy Statement was false

9    and misleading because the option grants were backdated.

10    **False 10-K Filings**

11        175.    In addition, the Company, with the knowledge, approval, and participation of

12    each of the Individual Defendants listed below, disseminated its false financial statements in,

13    *inter alia*, the following Form 10-K filings:

14–17        a.    Defendants Doris, Sauer, Moorer, Child, Greber, Marguglio and Leighton, who signed the Form 10-K for the fiscal year ended March 31, 1996, filed with the SEC on July 1, 1996, knowingly approved the false statements in the 10-K and knew that the statements contained therein were false because they backdated the option grants and knew that they were violating APB 25 and Section 162(m);

18–21        b.    Defendants Doris, Sauer, Moorer, Child, Greber, Marguglio and Leighton, who signed the Form 10-K for the fiscal year ended March 31, 1997, filed with the SEC on June 30, 1997, knowingly approved the false statements in the 10-K and knew that the statements contained therein were false because they backdated the option grants and knew that they were violating APB 25 and Section 162(m);

22–25        c.    Defendants Doris, Sauer, Moorer, Child, Greber, Marguglio and Leighton, who signed the Form 10-K for the fiscal year ended March 31, 1998, filed with the SEC on June 29, 1998, knowingly approved the false statements in the 10-K and knew that the statements contained therein were false because they backdated the option grants and knew that they were violating APB 25 and Section 162(m);

26–28        d.    Defendants Doris, Sauer, Child, Greber, Marguglio and Leighton, who signed the Form 10-K for the fiscal year ended March 31, 1999, filed with the SEC on June 29, 1999, knowingly approved the false statements in the 10-K and knew that the statements

contained therein were false because they backdated the option grants and knew that they were violating APB 25 and Section 162(m);

e.      Defendants Doris, Sauer, Greber, Marguglio and Leighton, who signed the Form 10-K for the fiscal year ended March 31, 2000, filed with the SEC on June 28, 2000, knowingly approved the false statements in the 10-K and knew that the statements contained therein were false because they backdated the option grants and knew that they were violating APB 25 and Section 162(m);

f.      Defendants Doris, Sauer, Greber, Marguglio, Langley and Leighton, who signed the Form 10-K for the fiscal year ended March 31, 2001, filed with the SEC on June 27, 2001, knowingly approved the false statements in the 10-K and knew that the statements contained therein were false because they backdated the option grants and knew that they were violating APB 25 and Section 162(m);

g.      Defendants Doris, Sauer, Greber, Marguglio, Langley and Leighton, who signed the Form 10-K for the fiscal year ended March 31, 2002, filed with the SEC on June 28, 2002, knowingly approved the false statements in the 10-K and knew that the statements contained therein were false because they backdated the option grants and knew that they were violating APB 25 and Section 162(m);

h.      Defendants Doris, Sauer, Greber, Marguglio, Langley and Leighton, who signed the Form 10-K for the fiscal year ended March 31, 2003, filed with the SEC on June 26, 2003, knowingly approved the false statements in the 10-K and knew that the statements contained therein were false because they backdated the option grants and knew that they were violating APB 25 and Section 162(m);

i.      Defendants Doris, Sauer, Greber, Marguglio, Langley and Leighton, who signed the Form 10-K for the fiscal year ended March 31, 2004, filed with the SEC on June 14, 2004, knowingly approved the false statements in the 10-K and knew that the statements contained therein were false because they backdated the option grants and knew that they were violating APB 25 and Section 162(m);

j.      Defendants Doris, Sauer, Greber, Marguglio, Langley and Leighton, who signed the Form 10-K for the fiscal year ended March 31, 2005, filed with the SEC on June 29, 2005, knowingly approved the false statements in the 10-K and knew that the statements contained therein were false because they backdated the option grants and knew that they were violating APB 25 and Section 162(m); and

k.      Defendants Doris, Sauer, Greber, Marguglio, Langley and Leighton, who signed the Form 10-K for the fiscal year ended March 31, 2006, filed with the SEC on June 14, 2006, knowingly

> approved the false statements in the 10-K and knew that the statements contained therein were false because they backdated the option grants and knew that they were violating APB 25 and Section 162(m).

176.    Specifically, in the Company's annual reports on Forms 10-K for fiscal years 1995 to 2005, the Individual Defendants as listed above knowingly caused Sonic to falsely state that the Company used the intrinsic value method specified by APB No. 25 to calculate compensation expense associated with issuing stock options and, accordingly, recorded no such expense as such issuances were at the fair value of the Company's common stock at the date of grant. Under APB 25, if the exercise price of the Company's stock options is not less than the market price of the underlying stock on the date of grant, no compensation expense is recognized. Such statements were materially false and misleading in each of these years because Sonic had granted stock options at prices that were below fair market value on the date of the grant and failed to account for the in-the-money options as required by APB 25.

177.    As alleged previously, APB 25 required the Individual Defendants to record compensation expense for options that were "in-the-money" on the date of grant. However, they did not do so, thereby materially understating Sonic's compensation expense and materially overstating Sonic's net income or materially understating its net loss. These statements were designed to conceal, and did in fact conceal, the fact that the Individual Defendants were engaged in a continuous and systematic scheme of backdating stock option grants to Sonic insiders in violation of state and federal laws.

178.    Additionally, Sonic's materially false and misleading financial statements for fiscal years 1995 to 2002 were included in its Forms 10-K filed for subsequent fiscal years. For this reason, and to the extent they included financials from earlier periods, Sonic's annual reports on Form 10-K for fiscal years 2003 through 2006 were also materially false and misleading. By participating in the secret backdating of stock options, and by reviewing and/or signing these subsequent annual reports, the Individual Defendants knew, or were reckless in not knowing, that the financial statements in these later filings were materially false and misleading.

179.    The Individual Defendants' secret option backdating scheme caused each of

1  Sonic's Forms 10-K for the relevant period to materially understate Sonic's compensation

2  expense and materially overstate the Company's net income or materially understate its net loss,

3  because the Individual Defendants failed to expense the "in-the-money" portion of Sonic's stock

4  option grants during the period as required by APB 25.

5  **False CEO and CFO Certifications**

6      180.    In connection with the filing of certain Annual Reports on Form 10-K during the

7  relevant period, Doris and Leighton also filed false Certifications of Chief Executive Officer and

8  Chief Financial Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906

9  of the Sarbanes-Oxley Act of 2002 (the "Certification").

10     181.    In each Certification, Doris and Leighton made certain representations with

11  respect to the accuracy and truthfulness of the information contained therein.  Defendants Doris

12  and Leighton filed on Form 10-K with the SEC the following false certifications:

13              A.    Form 10-K for the fiscal year ended March 31, 2003, filed with the
                      SEC on June 26, 2003;
14

15              B.    Form 10-K for the fiscal year ended March 31, 2004, filed with the
                      SEC on June 14, 2004;

16              C.    Form 10-K for the fiscal year ended March 31, 2005, filed with the
                      SEC on June 29, 2005;
17

18     182.    Each false Certification contained the following representations by Doris and

19  Leighton:

20      I, Robert J. Doris/A. Clay Leighton, certify that:

21              1.    I have reviewed this annual report on Form 10-K of Sonic
                      Solutions;
22

23              2.    Based on my knowledge, this annual report does not contain any
                      untrue statement of a material fact or omit to state a material fact
24                    necessary to make the statements made, in light of the
                      circumstances under which such statements were made, not
25                    misleading with respect to the period covered by this annual report;

26              3.    Based on my knowledge, the financial statements, and other
                      financial information included in this annual report, fairly present
27                    in all material respects the financial condition, results of operations
                      and cash flows of the registrant as of, and for, the periods
28                    presented in this annual report;

CONSOLIDATED CLASS ACTION AND SHAREHOLDER DERIVATIVE COMPLAINT
Case No. C-07-1500-CW

4.   The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and we have:

   a)   Designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

   b)   Evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and

   c)   Presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5.   The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

   a)   All significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

   b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6.   The registrant's other certifying officers and I have indicated in this annual report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

   *          *          *          *          *          *          *

I, Robert J. Doris/A. Clay Leighton, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to my knowledge:

CONSOLIDATED CLASS ACTION AND SHAREHOLDER DERIVATIVE COMPLAINT
Case No. C-07-1500-CW

- the Annual Report of Sonic Solutions on Form 10-K for the year ended March 31, [] fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

- the information contained in such Annual Report fairly presents in all material respects the financial condition and results of operations of Sonic Solutions.

### False Form 4 Filings

183.    Furthermore, from 1995 to 2006, Sonic, with the knowledge, approval, and participation of each of the Defendants listed below, for the purpose and with the effect of concealing the improper option backdating, filed with the SEC numerous Forms 4 that falsely reported the dates of stock option grants to the following Defendants:

a.    Doris's Form 4 filed with the SEC on January 23, 2006 falsely reported that options granted to Doris had been granted on September 2, 1998, September 9, 1999 and July 12, 2001 and had options repriced on March 3, 1998;

b.    Sauer's Form 4 filed with the SEC on January 23, 2006 falsely reported that options granted to Sauer had been granted on September 2, 1998, September 9, 1999 and July 12, 2001 and had options repriced on March 3, 1998;

c.    Leighton's Form 4 filed with the SEC on December 9, 2005 falsely reported that options granted to Leighton had been granted on July 19, 1996;

d.    Leighton's Form 4 filed with the SEC on August 25, 2005 falsely reported that options granted to Leighton had been granted on November 21, 1995 and October 25, 2001;

e.    Leighton's Form 4 filed with the SEC on December 29, 2004 falsely reported that options granted to Leighton had been granted on November 21, 1995;

f.    Leighton's Form 4 filed with the SEC on May 25, 2004 falsely reported that options granted to Leighton had been granted on October 25, 2001;

g.    Leighton's Form 4 filed with the SEC on February 27, 2004 falsely reported that options granted to Leighton had been granted on October 25, 2001;

h.    Leighton's Form 4 filed with the SEC on February 19, 2004 falsely reported that options granted to Leighton had been granted on October 25, 2001;

i.   Leighton's Form 4 filed with the SEC on December 10, 2003 falsely reported that options granted to Leighton had been granted on November 21, 1995;

j.   Leighton's Form 4 filed with the SEC on September 4, 2003 falsely reported that options granted to Leighton had been granted on March 11, 2003;

k.   Leighton's Form 4 filed with the SEC on August 12, 2003 falsely reported that options granted to Leighton had been granted on November 21, 1995, August 20, 1999 and July 12, 2001; and

l.   Kryzan's Form 4 filed with the SEC on May 15, 2003 falsely reported that options granted to Kryzan on February 19, 1996 had been subsequently repriced to an exercise price corresponding to Sonic's closing price on March 3, 1998.

184.    The preceding Defendants knew or should have known about these misstatements and omissions and failed to prevent or correct them.

## SONIC'S FALSE FINANCIAL REPORTING

## IN VIOLATION OF GAAP, SEC REGULATIONS AND IRS RULE

185.    As a result of the Individual Defendants' improper backdating and other manipulation of stock options, the Individual Defendants caused Sonic to violate GAAP, SEC regulations and Internal Revenue Service ("IRS") rules and regulations.

186.    Sonic's financial results for 1995 through 2003 were included in reports filed with the SEC and in other shareholder reports. In these reports, the Individual Defendants represented that Sonic's financial results were presented in a fair manner and in accordance with GAAP.

187.    The Individual Defendants' representations were false and misleading as to the financial information reported, as such financial information was not prepared in conformity with GAAP, nor was the financial information "a fair presentation" of the Company's financial condition and operations, causing the financial results to be presented in violation of GAAP and SEC rules.

188.    GAAP consists of those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at the particular time. Regulation S-X, to which the Company is subject as a registrant under the Securities Exchange Act of 1934 ("Exchange Act"), 17 C.F.R. § 210.4-01(a)(1), provides that

1  financial statements filed with the SEC, which are not prepared in compliance with GAAP, are

2  presumed to be misleading and inaccurate.

3                               **Violations of GAAP**

4      189.    During the relevant period, the Individual Defendants caused the Company to

5  understate its compensation expense by not properly accounting for its stock options under

6  GAAP, thus overstating the Company's net income or understating the Company's net loss.

7      190.    Under well-settled accounting principles in effect throughout the relevant period,

8  Sonic did not need to record an expense for stock options granted to employees or directors at

9  the current market price ("at the money"). The Company was, however, required to record an

10 expense in its financial statements for any stock options granted below the current market price

11 ("in the money"). In order to provide Sonic executives and employees with far more lucrative

12 "in the money" stock options, while avoiding having to inform shareholders about millions of

13 dollars incurred by the Company in compensation expenses (and without paying the IRS millions

14 of dollars in employment taxes), the Individual Defendants systematically falsified Company

15 records to create the false appearance that stock options had been granted at the market price on

16 an earlier date.

17     191.    Throughout the relevant period, Sonic accounted for stock options using the

18 intrinsic method described in APB 25, employers were required to record as an expense on their

19 financial statements the "intrinsic value" of a fixed stock option on its "measurement date." A

20 stock option that is "in the money" on the measurement date has intrinsic value, and the

21 difference between its exercise price and the quoted market price must be recorded as

22 compensation expense to be recognized over the vesting period of the option. Stock options that

23 are "at the money" or "out of the money" on the measurement date need not be expensed.

24 Excluding non-employee directors, APB 25 required employers to record compensation

25 expenses on stock options granted to non-employees irrespective of whether they were "in the

26 money" or not on the date of grant.

27

28
   CONSOLIDATED CLASS ACTION AND SHAREHOLDER DERIVATIVE COMPLAINT
   Case No. C-07-1500-CW

**Sonic's GAAP Violations Were Material**

192.    Sonic's false and misleading relevant period statements and omissions regarding its accounting were material, particularly in light of SEC guidance on materiality.  SEC Staff Accounting Bulletin ("SAB") Topic 1M, Materiality, summarizes GAAP definitions of materiality.  Among other items, SAB Topic 1M says: "A matter is 'material' if there is a substantial likelihood that a reasonable person would consider it important."  It also stresses that materiality requires qualitative, as well as quantitative, considerations.  For example, if a known misstatement would cause a significant market reaction, that reaction should be taken into account in determining the materiality of the misstatement.

193.    SAB Topic 1M further states:

> among the considerations that may well render material a quantitatively small misstatement of a financial statement item are –
>
> *        *        *
>
> whether the misstatement masks a change in earnings or other trends
>
> whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise
>
> *        *        *
>
> whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability.

194.    SAB Topic 1M also says that an intentional misstatement of even immaterial items may be illegal and constitute fraudulent financial reporting.

195.    Sonic's misstatements satisfy these criteria and thus were material from both a quantitative and qualitative perspective.

**Sonic's Financial Statements Violated Fundamental Concepts of GAAP**

196.    Due to these accounting improprieties, the Company presented its financial results and statements in a manner that violated GAAP, which are described by the following statements:

> (a)    The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual

financial statements (Accounting Principles Board Opinion No. 28, ¶10);

(b) The principle that financial reporting should provide information that is useful to existing and potential investors and creditors and other users in making rational investment, credit and similar decisions (Financial Accounting Standards Board ("FASB") Statement of Concepts No. 1, ¶34);

(c) The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (FASB Statement of Concepts No. 1, ¶40);

(d) The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to stockholders for the use of enterprise resources entrusted to it. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e) The principle that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶58-59);

(f) The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2, ¶79); and

(g) The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2, ¶¶95, 97).

197.    Further, the undisclosed adverse information concealed by the Individual Defendants during the relevant period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

///

///

///

## Sonic's Financial Statements Violated SEC Regulations

198.    During the relevant period, the Individual Defendants caused Sonic to violate SEC regulations by failing to disclose that the Company's senior executives had been granted backdated stock options.

199.    Under SEC Regulations, Item 8 of Form 14-A and Item 11 of Form 10-K, an issuer must furnish information required by Item 402 of Regulation S-K [17 C.F.R. § 229.303]. Item 402(b) and (c) require a company to provide both a Summary Compensation Table and an Option/SAR Grants table identifying the compensation of the named executive officers – the Company's CEO and its next four most highly paid executives. Item 402 requires particularized disclosures involving a company's stock option grants in the last fiscal year. In the summary compensation table, the issuer must identify in a column "other annual compensation" received by the named executives that is not properly categorized as salary or bonus, including any "[a]bove market or preferential earnings on restricted stock, options, SARs or deferred compensation" paid to the officer during the period. Item 402(b)(2)(iii)(C)(2). In the option grant table, the issuer must identify in a column "[t]he per-share exercise or base price of the options. . . . If such exercise or base price is less than the market price of the underlying security on the date of grant, a separate, adjoining column shall be added showing market price on the date of grant. . . ." Item 402(c)(2)(iv).

200.    The Individual Defendants caused Sonic to violate SEC regulations by failing to disclose that the Company's named executive officers had been granted stock options with exercise prices below the market value on the date the Board approved the grant.

### Violations of IRS Rules and Regulations

201.    During the relevant period, the Individual Defendants further caused Sonic to violate IRS rules and regulations due to its improper accounting for the backdated stock options. As a result, the Company's tax liabilities were understated, exposing Sonic to potential amounts owed for back taxes, penalties and interest to the IRS for improperly reporting compensation.

1    202.    The Individual Defendants caused the Company to violate Section § 162(m),
2    which generally limits a publicly traded company's tax deductions for compensation paid to each
3    of its named executive officers to $1 million unless the pay is determined to be "performance-
4    based." In order for compensation to be performance-based, the Compensation Committee or
5    Board must have set pre-established and objective performance goals. The goals must then be
6    approved by the shareholders. Section 162(m) defines stock options as performance-based
7    provided they are issued at an exercise price that is no less than the fair market value of the stock
8    on the date of the grant. Accordingly, properly issued stock options do not have to be taken into
9    account in calculating whether an executive's compensation has exceeded the $1 million
10   compensation cap.

11   203.    Section 162(m), known as the $1 million rule, was enacted in 1993 in order to tie
12   top executives' soaring pay packages more closely to a company's performance. This change in
13   the tax law turned compensation practices for a company's top executives away from straight
14   salary-based compensation to performance-based compensation, including stock options.
15   According to former SEC Chairman Harvey L. Pitt: "What [162[m]] did was create incentives to
16   find other forms of compensation so people could get over the $1 million threshold without
17   running afoul of the code."

18   204.    The Individual Defendants caused Sonic to violate Section 162(m) by providing
19   backdated stock options to the Company's named executive officers, which were granted with
20   exercise prices that were less than the fair market value of the stock on the date of the grant. As
21   a result all of the income resulting from the exercise of the stock options must be included for
22   purposes of calculating whether the named executive's compensation exceeds the $1 million cap
23   for federal tax purposes.

24   205.    The Individual Defendants further caused the Company to violate IRS rules and
25   regulations in order to avoid having to withhold income and Federal Insurance Compensation
26   Act ("FICA") tax from its executives and employees upon the exercise of Sonic's stock options.

27

28

1    by improperly accounting for its Nonqualified Stock Options ("NSOs") as Incentive Stock
2    Options ("ISOs").

3        206.    ISOs are a form of equity compensation that may be provided to a company's
4    employees.  ISOs are required to be granted at an exercise price that is no less than the fair
5    market value of the stock on the date of the grant and are entitled to preferential tax treatment as
6    they are not subject to income tax upon exercise of the options but only upon sale of the stock
7    (except for the possible imposition of alternative minimum tax on the option spread at the time of
8    exercise).  Stock options that do not qualify as ISOs are considered to be NSOs.  NSOs are not
9    entitled to preferential treatment as they are subject to income tax and FICA withholding upon
10   exercise. As a result, a company that fails to withhold income tax and/or FICA upon the exercise
11   of NSOs by its employees would be liable for the amount of the income tax and FICA that the
12   company failed to withhold upon exercise of the stock options, in addition to interest and
13   penalties.

14       207.    By improperly treating its backdated stock options as ISOs, the Individual
15   Defendants failed to provide proper income tax and FICA withholdings upon the exercise of its
16   stock options by its executives and employees in violation of IRS rules and regulations.

17       208.    Meanwhile, the Individual Defendants were causing the Company to grant
18   backdated Sonic stock options to the Option Recipient Defendants.  The Company's executives
19   received a significant number of backdated Sonic stock option grants as compensation during the
20   relevant period.

21       209.    Moreover, as alleged herein, in the Reports of the Board Regarding Executive
22   Compensation in the Company's proxy statements filed between 1996 and 2003, Sonic falsely
23   stated that its executive compensation program was designed to "emphasize sustained
24   performance by aligning rewards with shareholder interests" and "motivate executives and
25   employees to achieve Sonic's annual and long-term business goals and encourage behavior
26   toward the fulfillment of those objectives," when, in fact, the executives received instant profits
27   regardless of whether the Company achieved its objectives.

28   CONSOLIDATED CLASS ACTION AND SHAREHOLDER DERIVATIVE COMPLAINT
     Case No. C-07-1500-CW
                                                                                        -67-

**INDIVIDUAL DEFENDANTS' BREACHES OF FIDUCIARY DUTIES**

210.    In a misguided effort to attract and retain employees in a competitive environment, the Individual Defendants exceeded the bounds of the law and legitimate business judgment by perpetrating their options manipulation scheme.    The Individual Defendants' misconduct was unjustifiable and constituted a gross breach of their fiduciary duties as officers and/or directors of the Company.    Specifically, the Individual Defendants breached their fiduciary duties by colluding with each other to:

      a.      to backdate stock option grants;

      b.      violate GAAP;

      c.      produce and disseminate to Sonic shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options; and

      d.      file false proxy statements, false financial statements and false Form 4s in order to conceal the improper backdating of stock options.

211.    The Individual Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment.    Rather, it was intended to, and did, unduly benefit the option recipients at the expense of the Company.

212.    As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained millions of dollars in damages, including, but not limited to, the additional compensation expenses and tax liabilities the Company will be required to incur, the loss of funds paid to the Company upon the exercise of stock options resulting from the difference between the fair market value of the stock option on the true date of grant and the price that was actually paid as a result of the backdated stock option grant, costs and expenses incurred in connection with the Company's internal investigation and restatement of historical financial statements.

213.    The Individual Defendants have exercised thousands of misdated options at improperly low prices and have then sold the shares for substantial profits.    Consequently, the Individual Defendants have been unjustly enriched by garnering millions of dollars in illicit

CONSOLIDATED CLASS ACTION AND SHAREHOLDER DERIVATIVE COMPLAINT
Case No. C-07-1500-CW

1 profits and depriving the Company of millions of dollars in payments that the Company should

2 have received upon exercise of the options.

3 ## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

4     214.    Plaintiffs bring this action derivatively in the right and for the benefit of the

5 Company to redress the Individual Defendants' breaches of fiduciary duties, unjust enrichment,

6 statutory violations and other violations of law.

7     215.    Plaintiffs are holders of Sonic common stock and were holders of Sonic common

8 stock since the dates set forth in paragraphs 17 through 19, above.

9     216.    Plaintiffs will adequately and fairly represent the interests of the Company and its

10 shareholders in enforcing and prosecuting their rights.

11     217.    As a result of the facts set forth herein, Plaintiffs have not made any demand on

12 Sonic's Board to institute this action against the Individual Defendants.  Such demand would be

13 a futile and useless act because the Board is incapable of making an independent and

14 disinterested decision to institute and vigorously prosecute this action.

15     218.    At the time this action commenced, the Board consisted of five directors:

16 defendants Doris, Sauer, Greber, Marguglio and Langley.  For all the reasons stated herein,

17 defendants Doris, Sauer, Greber, Margugulio and Langley are incapable of independently and

18 disinterestedly considering a demand to commence and vigorously prosecute this action.  Their

19 positions during the relevant period are summarized in the table below:

| Name | Recipient of Backdated Stock Option Grant(s) | Member of the Board during the relevant period | Member of the Audit Committee during the relevant period |
|---|---|---|---|
| Doris | x | x | |
| Sauer | x | x | |
| Greber | | x | x |
| Marguglio | | x | x |
| Langley | | x | x |

27     219.    At all relevant times, the entire Board was responsible for making all

28

1    compensation related decisions, including granting stock options:

> The Board does not have a Compensation Committee. Accordingly, *it is the responsibility of the entire Board* to determine the most effective total executive compensation strategy, *based upon Sonic's business needs and consistent with the shareholders' interests, to administer Sonic's executive compensation plans, programs and policies*, to monitor corporate performance and its relationship to compensation of executive officers, and to take other appropriate actions concerning matters of executive compensation

7    220.    From 1995 to 2003, the Board knowingly and deliberately backdated stock option

8    grants to make it appear as though the grants were made on dates when the market price of Sonic

9    stock was lower than the market price on the actual grant dates, thereby unjustly benefiting the

10    recipients of the backdated options. By colluding with the recipients of backdated options and

11    others, as alleged herein, defendants Doris, Sauer, Greber, Marguglio and Langley have

12    demonstrated that they are unable or unwilling to act independently of the recipients of

13    backdated or otherwise manipulated stock option grants.

14    221.    Moreover, by improperly granting backdated stock option grants and granting

15    stock options below fair market value, defendants Doris, Sauer, Greber, Marguglio and Langley

16    knowingly and deliberately participated in and approved the Company's violations of the Plans,

17    GAAP and Section 162(m), as alleged herein, and therefore are substantially likely to be held

18    liable for the misconduct complained of herein.

19    222.    In addition, defendants Doris, Sauer, Greber, Margugulio and Langley are all

20    incapable of disinterestedly considering a demand because they violated California law by failing

21    to schedule, provide notice of, or hold an annual meeting within the 15 month statutory period as

22    required by Cal. Corp. Code § 600(c). These defendants' violation of California law was not and

23    could not have been the result of an exercise of good faith business judgment.

24    223.    Furthermore, Doris and Sauer are also recipients of the improperly backdated

25    stock options and thus are directly interested in the wrongdoing complained of herein.

26    Moreover, Doris and Sauer are married to each other, and because they share this close personal

27    and professional relationship, are incapable of independently and disinterestedly considering a

28

1   demand to commence and vigorously prosecute this action against the Individual Defendants.

2       224.    At all relevant times, the Audit Committee members (Greber, Margugulio and

3   Langley) were charged with the following responsibilities pursuant to Sonic's Audit Committee

4   Charter:

    a.    Monitor the integrity of the financial statements of Sonic;

    b.    Meet with management and the independent auditor to review and discuss the annual financial statements and the report of the independent auditor thereon and, to the extent the independent auditor or management brings any such matters to the attention of the audit committee, to discuss significant issues encountered in the course of the audit work, including restrictions on the scope of activities, access to required information or the adequacy of internal controls;

    c.    Meet quarterly with management and the independent auditor to review and discuss the quarterly financial statements; provided that this responsibility may be delegated to the chairman of the audit committee;

    d.    Meet at least once each year in separate executive sessions with management and the independent auditor to discuss matters that the committee or either of these groups believes could significantly affect the financial statements and should be discussed privately;

    e.    Provide minutes of audit committee meetings to the board of directors on any significant matters arising from the committee's work; and

    f.    Prepare the report required by the rules of the Securities and Exchange Commission to be included in Sonic's annual proxy statement.

    225.    Defendants Greber, Margugulio and Langley, as members of the Audit Committee, knowingly and deliberately participated in and approved the Company's violations of the Plans, GAAP and Section 162(m), as alleged herein, by approving the filing of and signing false financial statements and other false SEC filings and therefore are substantially likely to be held liable for the misconduct complained of herein

    226.    Furthermore, demand is excused because the misconduct complained of herein was not, and could not have been, an exercise of good faith business judgment. As represented in Sonic's proxy statements, the stated purpose of the Company's shareholder approved stock option plans is to closely align the interests of shareholders, executives and employees.

CONSOLIDATED CLASS ACTION AND SHAREHOLDER DERIVATIVE COMPLAINT
Case No. C-07-1500-CW

1 However, by backdating stock option grants, defendants Doris, Sauer, Greber, Marguglio and
2 Langley undermined the purpose of the stock option plans by awarding employees compensation
3 that had intrinsic value regardless of Sonic's stock performance. In effect, this practice was
4 nothing more than secret handouts to executives and employees at the expense of unsuspecting
5 shareholders.

6     227.   Defendants Doris, Sauer, Greber, Marguglio and Langley could have achieved the
7 stated purpose of aligning the interests of shareholders, executives and employees, by granting
8 those executives and employees additional stock options under their stock option plans or by
9 granting stock options at a price less than the fair market value on the date of the grant and
10 simply disclosing and expensing these grants. Instead, the Individual Defendants backdated
11 stock option grants and granted stock options below fair market value in violation of the stock
12 option plans and improperly reported these grants in the Company's financial disclosures to
13 improve Sonic's bottom line.

14     228.   The practice of backdating stock option grants and granting stock options below
15 fair market value cannot be a valid exercise of business judgment because it has subjected Sonic
16 to massive liability. Sonic will also suffer tax liabilities for the additional compensation it has to
17 expense, and it has tarnished its reputation in the investment community through this deliberate
18 and calculated conduct.

19                         **CLASS ACTION ALLEGATIONS**

20     229.   Plaintiffs bring Count VIII of this action on their own behalf and as a class action
21 on behalf of all Class members, as defined herein.

22     230.   The "Class" consists of all persons who held Sonic common stock on the date of
23 filing of this Complaint. Excluded from the Class are defendants and their respective families,
24 subsidiaries, affiliates, and successors.

25     231.   Membership in the Class is so numerous as to make joinder of all Class members
26 impracticable. There are millions of shares of Sonic common stock outstanding. The disposition
27 of the Class' claims in a class action will provide substantial benefits to the parties and the Court.

28 CONSOLIDATED CLASS ACTION AND SHAREHOLDER DERIVATIVE COMPLAINT
Case No. C-07-1500-CW
-72-

232.    There are numerous and substantial questions of law and fact common to all members of the Class which control this litigation and which predominate over any individual issues. The common questions of law and fact include:

    a.    whether the defendants violated California law as alleged herein; and

    b.    whether the relief requested herein on behalf of the Class should be granted.

233.    The claims of Plaintiffs are typical of the claims of the Class and Plaintiffs have no interest adverse to the interests of the other members of the Class.

234.    A class action is superior to other methods for the fair and efficient adjudication of this controversy for, *inter alia,* the following reasons:

    a.    the prosecution of separate actions would create a risk of inconsistent or varying adjudications;

    b.    the defendants have acted on grounds generally applicable to the Class;

    c.    because of the complexity of the issues involved in this litigation, the size of the individual Class members' claims, and the limited resources of the Class members, few, if any, Class members could afford to seek legal redress individually for the wrongs the defendants committed;

    d.    this action will cause an orderly and expeditious administration of the Class' claims, and will foster economies of time, effort and expenses;

    e.    when the liability of the defendants has been adjudicated, claims of all members of the Class can be determined by the Court; and

    f.    this action presents no difficulty that would impede its management by the Court as a class action and is the best available means by which Plaintiffs and other members of the Class can seek redress for the harm caused by the defendants.

## COUNT I
### Against Defendants Doris, Sauer, Moorer, Child, Greber, Marguglio, Langley and Leighton for Violations of § 10(b) and Rule 10b-5 of the Securities Exchange Act

235.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

CONSOLIDATED CLASS ACTION AND SHAREHOLDER DERIVATIVE COMPLAINT
Case No. C-07-1500-CW

-73-

1    236.    Throughout the relevant period, Defendants Doris, Sauer, Moorer, Child, Greber,

2  Marguglio, Langley and Leighton individually and in concert, directly and indirectly, by the use

3  and means of instrumentalities of interstate commerce and/or of the mails, intentionally or

4  recklessly employed devices, schemes and artifices to defraud and engaged in acts, practices and

5  a course of business which operated as a fraud and deceit upon the Company.

6    237.    Defendants Doris, Sauer, Moorer, Child, Greber, Marguglio, Langley and

7  Leighton, as top executive officers and/or directors of the Company, are liable as direct

8  participants in the wrongs complained of herein.  Through their positions of control and authority

9  as officers and/or directors of the Company, Defendants Doris, Sauer, Moorer, Child, Greber,

10  Marguglio, Langley and Leighton were able to and did control the conduct complained of herein.

11    238.    Defendants Doris, Sauer, Moorer, Child, Greber, Marguglio, Langley and

12  Leighton acted with scienter in that they either had actual knowledge of the fraud set forth

13  herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose

14  the true facts, even though such facts were available to them.  Defendants Doris, Sauer, Moorer,

15  Child, Greber, Marguglio, Langley and Leighton were among the senior management and

16  directors of the Company and were therefore directly responsible for the fraud alleged herein.

17    239.    The Company relied upon the Defendants Doris, Sauer, Moorer, Child, Greber,

18  Marguglio, Langley and Leighton's fraud in granting themselves and the other Individual

19  Defendants options to purchase shares of the Company's common stock, as alleged herein.

20    240.    As a direct and proximate result of the Defendants Doris, Sauer, Moorer, Child,

21  Greber, Marguglio, Langley and Leighton's foregoing breaches of fiduciary duties, the Company

22  has sustained substantial damages, as alleged herein.

23  <div align="center">

**COUNT II**
**Against Defendants Doris, Sauer, Moorer, Child, Greber, Marguglio, Langley and**
**Leighton for Violations of § 14(a) of the Securities Exchange Act**
</div>

24

25    241.    Plaintiffs incorporate by reference and reallege each and every allegation set forth

26  above, as though fully set forth herein.

27

28

1    242.    Rule 14-A-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that

2    no proxy statement shall contain "any statement which, at the time and in the light of the

3    circumstances under which it is made, is false or misleading with respect to any material fact, or

4    which omits to state any material fact necessary in order to make the statements therein not false

5    or misleading." 17 C.F.R. § 240.14-A-9.

6    243.    The proxy statements described herein violated § 14(a) and Rule 14-A-9 because

7    they omitted material facts, including the fact that Defendants Doris, Sauer, Moorer, Child,

8    Greber, Marguglio, Langley and Leighton were causing the Company to engage in a stock option

9    grant backdating scheme, a fact which the Defendants Doris, Sauer, Moorer, Child, Greber,

10   Marguglio, Langley and Leighton were aware of and/or participated in from at least 1995 to

11   2003.

12   244.    In the exercise of reasonable care, Defendants Doris, Sauer, Moorer, Child,

13   Greber, Marguglio, Langley and Leighton should have known that the proxy statements were

14   materially false and misleading.

15   245.    The misrepresentation and omissions in the proxy statements were material. The

16   proxy statements were an essential link in the accomplishment of the continuation of the

17   Individual Defendants' unlawful stock option grant backdating scheme, as revelations of the

18   truth would have immediately thwarted a continuation of shareholders' endorsement of the

19   directors' positions, the executive officers' compensation and the Company's compensation

20   policies.

21   246.    The Company was damaged as a result of the material misrepresentations and

22   omissions in the proxy statements.

23                                    **COUNT III**
     **Against Defendants Doris, Sauer, Moorer, Child, Greber, Marguglio, Langley and**
24              **Leighton for Violations of § 20(a) of the Securities Exchange Act**

25   247.    Plaintiffs incorporate by reference and reallege each and every allegation set forth

26   above, as though fully set forth herein.

27

28   CONSOLIDATED CLASS ACTION AND SHAREHOLDER DERIVATIVE COMPLAINT
     Case No. C-07-1500-CW
                                                                                    -75-

1    248.    Defendants Doris, Sauer, Moorer, Child, Greber, Marguglio, Langley and
2  Leighton, by virtue of their positions with the Company and specific acts, were, at the time of the
3  wrongs alleged herein, controlling persons of the Company within the meaning of § 20(a) of the
4  Exchange Act.    Defendants Doris, Sauer, Moorer, Child, Greber, Marguglio, Langley and
5  Leighton had the power and influence, and exercised the same, to cause the Company to engage
6  in the illegal conduct and practices complained of herein.

7
<div align="center">**COUNT IV**
**Against the Individual Defendants**
**for Accounting**</div>
8

9    249.    Plaintiffs incorporate by reference and realleges each and every allegation set
10  forth above, as though fully set forth herein.

11    250.    As alleged in detail herein, each of Individual Defendants had a fiduciary duty to,
12  among other things, refrain from unduly benefiting themselves and other Company insiders at
13  the expense of the Company.

14    251.    As alleged in detail herein, the Individual Defendants breached their fiduciary
15  duties by, among other things, engaging in a scheme to grant backdated stock options to
16  themselves and/or certain other officers and employees of the Company and cover up their
17  misconduct.

18    252.    The Individual Defendants possess complete and unfettered control over the
19  improperly issued stock option grants and the books and records of the Company concerning the
20  details of such improperly backdated stock option grants.

21    253.    As a result of the Individual Defendants' misconduct, the Company has been
22  damaged financially and is entitled to a recovery as a result thereof.

23    254.    Plaintiff demands an accounting be made of all stock option grants made to any of
24  the recipients of backdated stock options or options granted below fair market value, including,
25  but not limited to, the dates of the grants, the amounts of the grants, the value of the grants, the
26  recipients of the grants, the dates the stock options were exercised, as well as the disposition of

27

28

1    any proceeds received by any of the recipients of backdated stock options or options granted

2    below fair market value via sale or other exercise of the grants.

3    <center>**COUNT V**
**Against the Individual Defendants for**
**Breach of Fiduciary Duty and/or Aiding and Abetting**</center>

4

5    255.    Plaintiffs incorporate by reference and reallege each and every allegation set forth

6    above, as though fully set forth herein.

7    256.    As alleged in detail herein, each of the Individual Defendants had a fiduciary duty

8    to, among other things, refrain from unduly benefiting themselves and other Company insiders at

9    the expense of the Company.

10    257.    As alleged in detail herein, the Individual Defendants breached their fiduciary

11    duties by, among other things, engaging in a scheme to grant backdated stock options and stock

12    options below fair market value to themselves and/or certain other officers and employees of the

13    Company and cover up their misconduct.

14    258.    In breach of their fiduciary duties of loyalty and good faith, the Individual

15    Defendants agreed to and did participate with and/or aided and abetted one another in a

16    deliberate course of action designed to divert corporate assets to themselves and/or other

17    Company insiders.

18    259.    The Individual Defendants' foregoing misconduct was not, and could not have

19    been, an exercise of good faith business judgment.  Rather, it was intended to, and did, unduly

20    benefit the Individual Defendants who received backdated stock options and stock options

21    granted below fair market value at the expense of the Company.

22    260.    As a direct and proximate result of the Individual Defendants' foregoing breaches

23    of fiduciary duties, the Company has sustained significant damages, as alleged herein.

24    <center>**COUNT VI**
**Against Defendants Doris, Sauer, Moorer, Kryzan, Paulsen, Costello and Leighton**
**for Unjust Enrichment**</center>

25

26    261.    Plaintiffs incorporate by reference and reallege each and every allegation set forth

27    above, as though fully set forth herein.

28

262.   Defendants Doris, Sauer, Moorer, Kryzan, Paulsen, Costello and Leighton were unjustly enriched by their receipt and retention of backdated stock option grants and stock options granted below fair market value and the proceeds they received through exercising these options, as alleged herein, and it would be unconscionable to allow them to retain the benefits thereof.

263.   To remedy Defendants Doris, Sauer, Moorer, Kryzan, Paulsen, Costello and Leighton's unjust enrichment, the Court should order them to disgorge to the Company all of the backdated stock options and stock options granted below fair market value that they received, including the proceeds of any such stock options that have been exercised, sold, pledged or otherwise monetized.

**COUNT VII**
**Against the Defendants Doris, Sauer, Moorer, Kryzan, Paulsen, Costello and Leighton**
**for Rescission**

264.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

265.   As a result of the acts alleged herein, the stock option contracts between the Defendants Doris, Sauer, Moorer, Kryzan, Paulsen, Costello and Leighton and the Company entered into during the relevant period were obtained through the Individual Defendants' fraud, deceit and abuse of control. Further, the backdated or otherwise manipulated Sonic stock options were illegal grants and thus invalid as they were not authorized in accordance with the terms of the Company's shareholder approved stock option plans.

266.   All contracts which provide for stock option grants to Defendants Doris, Sauer, Moorer, Kryzan, Paulsen, Costello and Leighton and were entered into during the relevant period should, therefore, be rescinded, with all sums paid under such contracts returned to the Company, and all such executory contracts cancelled and declared void.

**COUNT VIII**
**Against Defendants Doris, Sauer, Greber, Marguglio and Langley for**
**Violation of Cal. Corp. Code § 600(c)**

267.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

268.    Pursuant to the California Corporations Code, Sonic is required to hold an annual meeting of shareholders at least once every 15 months.

269.    Sonic's last annual meeting was held on November 11, 2005, more than 29 months ago.

270.    In violation of California law, Defendants Doris, Sauer, Greber, Marguglio and Langley failed to schedule, provide notice of, or hold an annual meeting for 2006 and 2007, and have yet to hold an annual meeting in 2008.

271.    To remedy Defendants Doris, Sauer, Greber, Marguglio and Langley's foregoing violation of California law, the Court should issue an Order requiring Defendants Doris, Sauer, Greber, Marguglio and Langley within ten (10) days to: (i) schedule an annual meeting of Sonic's shareholders to be held no later than sixty (60) days from the date of the Order; and (ii) provide to Sonic's shareholders notice of the annual meeting in accordance with Sonic's by-laws.

WHEREFORE, Plaintiffs demands judgment as follows:

A.    Issuing an Order requiring the Defendants Doris, Sauer, Greber, Marguglio and Langley within ten (10) days to: (i) schedule an annual meeting of Sonic's shareholders to be held no later than sixty (60) days from the date of the Order; and (ii) provide to Sonic's shareholders notice of the annual meeting in accordance with Sonic's by-laws;

B.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' misconduct;

C.    Ordering the recipients of backdated stock options to disgorge to the Company all of the backdated stock options they received, including the proceeds of any such stock options that have been exercised, sold, pledged or otherwise monetized, and imposing a constructive trust thereover;

D.    Granting appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties;

CONSOLIDATED CLASS ACTION AND SHAREHOLDER DERIVATIVE COMPLAINT
Case No. C-07-1500-CW

E.     Directing Sonic to take all necessary actions to reform and improve its corporate governance and internal control procedures to comply with applicable law, including, but not limited to, putting forward for a shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote;

F.     Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

G.     Granting such other and further relief as the Court deems just and proper.

### JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury.

Dated: April 30, 2008

Respectfully submitted,

SCHIFFRIN BARROWAY TOPAZ & KESSLER, LLP

__/s/_____
Alan R. Plutzik, Of Counsel (Bar No. 077785)
L. Timothy Fisher, Of Counsel (Bar No. 191626)
Nichole Browning (Bar No. 251937)
2125 Oak Grove Road, Suite 120
Walnut Creek, CA 94598
Telephone: (925) 945-0770
Facsimile: (925) 945-8792
      -and
Eric L. Zagar (Bar No. 250519)
J. Daniel Albert
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

*Attorneys for Plaintiffs*

<u>VERIFICATION</u>

I, Nichole Browning, hereby declare as follows:

1.    I am an attorney with the law firm of Schiffrin, Barroway, Topaz & Kessler, LLP, counsel for plaintiff Andrew Walter in the above-entitled action. I have read the foregoing Consolidated Class Action and Shareholder Derivative Complaint and know the contents thereof. I am informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

2.    I make this Verification because the plaintiff Andrew Walter is absent from the County of Contra Costa where I maintain my office.

Executed this 30th day of April, 2008.

_____
NICHOLE BROWNING

## VERIFICATION

I, Nichole Browning, hereby declare as follows:

1.     I am an attorney with the law firm of Schiffrin, Barroway, Topaz & Kessler, LLP, counsel for plaintiff James Forseth in the above-entitled action.  I have read the foregoing Consolidated Class Action and Shareholder Derivative Complaint and know the contents thereof. I am informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

2.     I make this Verification because the plaintiff James Forseth is absent from the County of Contra Costa where I maintain my office.

Executed this 30th day of April, 2008.


_____
NICHOLE BROWNING

<u>VERIFICATION</u>

I, Nichole Browning, hereby declare as follows:

1.      I am an attorney with the law firm of Schiffrin, Barroway, Topaz & Kessler, LLP, counsel for plaintiff James Pinno in the above-entitled action. I have read the foregoing Consolidated Class Action and Shareholder Derivative Complaint and know the contents thereof. I am informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

2.      I make this Verification because the plaintiff James Pinno is absent from the County of Contra Costa where I maintain my office.

Executed this 30th day of April, 2008.

_____
NICHOLE BROWNING